Raymond REESE, Appellant,

v.

The STATE of Texas.

No. 73281.

Court of Criminal Appeals of Texas.

Dec. 6, 2000.

Allen C. Isbell. Houston, for appellant.

1. Penal Code § 19.03(a).

2. Art. 37.071 § 2(g). Unless otherwise indicated all future references to Articles refer to the Code of Criminal Procedure.

S. Elaine Roch, Asst. Dist. Atty., Houston, Matthew Paul, State's Atty., Austin, for State.

PRICE, J., delivered the opinion of the Court in which MEYERS, HOLLAND, WOMACK, and JOHNSON, JJ., joined.

Rule of Evidence 403 prohibits the admission of evidence that is substantially more prejudicial than probative in criminal trials. During the punishment phase of the appellant's capital murder trial, the trial court admitted a photograph of the victim and her unborn child lying in the casket together at their wake. Because we find that the admission of the photograph violated Rule 403, we hold that the trial court abused its discretion in admitting the photograph.

The appellant was convicted of capital murder.[1] Pursuant to the jury's answers to the special issues set forth in Code of Criminal Procedure article 37.071 sections 2(b) and 2(e), the trial judge sentenced the appellant to death.[2] Direct appeal to this Court is automatic.[3] The appellant raises five points of error in which he challenges only the sentencing phase of his trial.

During the punishment stage of the appellant's trial, the State offered and the trial court admitted an eight-inch-by-ten-inch color photograph of Paula Birdow (Paula), a victim of the offense, in her casket. Also visible in the photograph is Paula's unborn child, who died when Paula was killed. The fetus had been removed from Paula after her death and wrapped in what appears to be a blanket. The appellant objected to the admission of the photograph. He complained that the photograph was irrelevant and that, even if relevant, its probative value was substantially outweighed by unfair prejudice. The trial court overruled the appellant's objection.

3. Art. 37.071 § 2(h).

In the appellant's second and third points of error, he complains that the photograph consisted of victim-impact evidence of a victim not named in the indictment.[4] As a result, he argues, the photograph was irrelevant and inadmissible. He also argues that, even if it was relevant, the probative value of the photograph was substantially outweighed by the danger of unfair prejudice.

The State argues that the photograph is relevant to show (1) the manner and method of Paula's death, (2) the results and foreseeable consequences of the appellant's actions, and (3) the appellant's violent and vicious nature.

First we must determine whether the photograph was relevant. We have held that evidence may be admitted during the punishment phase "on any matter the trial court deems relevant to answering the special issues."[5] Relevant evidence is that which "[has] any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable."[6] The trial court's determination of relevancy will not be reversed absent an abuse of discretion.[7] During the punishment phase, the jury is charged with answering two special issues: future dangerousness and mitigation.[8]

The photograph at issue does not show the manner or method of Paula's death. It does not show the way or process by which Paula was killed. One cannot tell from the picture how Paula died. Therefore it cannot be relevant to show the manner or method of her death.

It is arguable that the photograph shows the results and foreseeable consequences of the appellant's actions, the result being Paula's death.[9] The appellant could foresee that a funeral would be held for Paula. It is also arguable that the photograph shows the appellant's violent or vicious nature. The photograph shows that a pregnant woman died. Therefore we will assume, without deciding, that the photograph had at least some relevance to the jury's decision about the special issues.

Next, we must determine whether admission of the photograph constitutes an abuse of discretion under Rule 403. Relevant evidence is generally admissible, but it is properly excluded under Rule 403 when "its probative value is substantially outweighed by the danger of unfair prejudice."[10] Evidence is unfairly prejudicial when it has "an undue tendency to suggest that a decision be made on an improper basis."[11] We have said that a Rule 403 analysis by the trial court should include, but is not limited to, the following factors:

(1) how probative is the evidence;

(2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way;

4. The appellant cites *Cantu v. State*, 939 S.W.2d 627, 637 (Tex.Crim.App.1997) (holding that it was error to admit victim-impact evidence for a victim not named in the indictment because this evidence is irrelevant).

5. *Bell v. State*, 938 S.W.2d 35, 49 (Tex.Crim. App.1996). *See also* art. 37.071 § 2(a).

6. Tex.R.Evid. 401.

7. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1990) (Op. on Reh'g).

8. The special issues ask the jury to determine: (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(2) whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.
Art. 37.071 §§ 2(b)(1) & (2)(e)(1).

9. The photograph also shows the actions (presumably) of the medical examiner or the mortician.

10. Tex.R.Evid. 403.

11. *Montgomery*, 810 S.W.2d at 389.

(3) the time the proponent needs to develop the evidence; and

(4) the proponent's need for the evidence.[12]

The reviewing court should, using an abuse of discretion standard, "do more than decide whether the trial judge did in fact conduct the required balancing between probative and prejudicial values; 'the trial court's determination must be reasonable in view of all relevant facts.'"[13]

Therefore we hold that where the relevant criteria, viewed as objectively as possible, lead to the conclusion that the danger of unfair prejudice substantially outweighed the probative value of the proffered evidence, the appellate court should declare that the trial court erred in failing to exclude it. Relevant criteria gleaned from authorities include, *inter alia*, that the ultimate issue was not seriously contested by the opponent; that the State had other convincing evidence to establish the ultimate issue to which the [evidence] was relevant; that the probative value of the ... evidence was not, either alone or in combination with other evidence, particularly compelling; that the [evidence] was of such a nature that a jury instruction to disregard it for any but its proffered purpose would not likely have been efficacious. Accordingly, when the record reveals one or more such relevant criteria reasonably conducing to a risk that the probative value of the tendered evidence is substantially outweighed by unfair prejudice, then an appellate court should conclude that the trial court acted irrationally in failing to exclude it, and thus abused its discretion. The trial court has no "right" to be "wrong" if that means to admit evidence which appears to the appellate court, affording all due deference to the trial court's decision, nevertheless to be substantially more prejudicial than probative.[14]

■ In the context of the trial court's admitting a photograph, we should consider: the number of photographs, the size of the photograph, whether it is in color or black and white, the detail shown in the photograph, whether the photograph is gruesome, whether the body is naked or clothed, and whether the body has been altered since the crime in some way that might enhance the gruesomeness of the photograph to the appellant's detriment.[15]

The photograph at issue in this case was eight-inches-by ten-inches and in color. In the photograph, Paula and the unborn child are fully clothed. Paula's body had been altered; the fetus was removed from her body and wrapped in a blanket. There was only one photograph of Paula in her casket admitted in evidence. This was the only photograph admitted during the punishment phase of the trial.

The first factor for the Rule 403 analysis that we consider is the probative value of the evidence. We begin the discussion by assuming that the photograph is relevant to show the results and foreseeable consequences of the appellant's actions and the appellant's violent and vicious nature. The relevant facts for those purposes are that Paula had died, that Paula was pregnant at the time of her death, and that Paula's unborn child died because she died. The photograph shows these facts, but only incidentally. The photograph taken at Paula's funeral shows these things just as a photograph of Paula's tombstone or a copy of her obituary in the newspaper might show these facts. For the sake of

---

12. *Id.* at 389–90.

13. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex.Crim.App.1997) (quoting the plurality opinion in *Rachal v. State*, 917 S.W.2d 799, 808 (Tex.Crim.App.1996), and citing *Montgomery v. State*, 810 S.W.2d 372, 392 (Tex. Crim.App.1990)).

14. *Montgomery*, 810 S.W.2d at 392–93.

15. *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim.App.1992).

argument, we will assume that the probative value weighs in favor of the State.

The second factor—the ability of the photograph to impress the jury in some irrational yet indelible way—weighs strongly in the appellant's favor. This photograph shows much more than the facts relevant to the punishment phase. The dissent makes note of this when it says that "a picture is worth a thousand words." [16]

The verbal description of this photograph, including many of the facts depicted in the photograph, might be something like this: The coffin contained a lining made of white textured material. A spray of white flowers was placed next to the coffin. The coffin was open, and the victim was lying in it with one of her hands and her face showing. The victim's dress was white with gold and white buttons. She wore gold earrings and a gold bracelet. Her hair had been fixed with spiral curls. Magenta lipstick had been applied to her lips, eye makeup had been applied to her eyelids, and blush had been applied to her cheeks. The unborn child had been removed from her body,[17] cleaned, and swaddled in white material, possibly a blanket. The unborn child was placed next to his mother with only his face was showing. The unborn child is miniature in form and his face is only a fraction of the size of his mother's hand.

Although the photograph depicts all of these facts, they are not relevant to the jury's determination of the special issues. The unborn child in the photograph appears tiny, innocent, and vulnerable. Society's natural inclination is to protect the innocent and the vulnerable. The contents of the photograph has an emotional impact that suggests that the jury's decision be made on an emotional basis and not on the

basis of the other relevant evidence introduced at trial.

The third factor—the time needed to develop the evidence—weighs in favor of the State. It did not take much time to lay the foundation for admission of the photograph.

The fourth factor—the proponent's need for the evidence—has three subparts: "[1] Does the proponent have other available evidence to establish the fact of consequence that the [evidence] is admissible to show? [2] If so, how strong is that other evidence? [3] And is the fact of consequence related to an issue that is in dispute?"

The State had other photographs, admitted during the guilt-innocence phase, that would have served the proper purposes of this photograph. The State offered and the jury saw photographs from the crime scene and from the autopsies of Michael and Paula. These photographs showed the consequences of the appellant's conduct and his violent nature in killing. The appellant did not challenge that Paula was killed or that the fetus was also killed. The jury, by its verdict of guilt, had already found beyond a reasonable doubt that the victim was dead. The photograph was relevant to show those facts, but those facts were not in dispute during the punishment phase.

There is no indication that the State had other pictures of the fetus; but the death of the fetus was not a fact of consequence related to an issue in dispute. If the line is not drawn here, where should it be drawn? Would a picture from an ultrasound of a three-month old fetus be admissible if the mother was killed in a violent attack? What if she were killed in a traffic accident?

We find that the second and fourth factors weigh heavily in favor of the appel-

---

**16.** *Post* at 248.

**17.** The record does not indicate when the fetus was removed from Paula's body. Photographs from the autopsy that were introduced during the guilt-innocence phase of the trial show that Paula's abdomen was still intact. There is no indication that the fetus was removed to attempt to save his life.

lant. Although the third and possibly the first factors weigh in favor of the State, these factors are not enough to overcome the prejudicial qualities of the photograph and the State's limited need for the photograph in the context of the contested issues. We hold that the photograph was substantially more prejudicial than probative and that the trial court abused its discretion by admitting the photograph.

Because this is the first time this Court has reviewed a photograph of an unborn child in a casket, the dissent looks to other jurisdictions that have dealt with this issue. The cases cited by the dissent are distinguishable.

In *State v. Alfieri*,[18] and *State v. Williamson*,[19] Ohio and Tennessee courts permitted the admission of pictures of unborn children. In both cases, the subjects of the pictures were victims named in the indictments, and the photographs had been introduced during the guilt-innocence phase of the trials.[20] Although the photograph in this case was admitted during the punishment phase when evidence is more likely to be admissible, the facts that the photograph depict are not facts of consequence that were in dispute.

The dissent also compares the photograph in this case with that in *Beckwith v. State*.[21] In that case, a photograph of a murder victim in his casket was admitted. The court in that case said that the photograph was relevant to show the circumstances of the killing and the corpus delicti.[22] The dissent argues that our case is very similar to *Beckwith*. Again the facts that the photograph in the instant case show are not facts of consequence that were disputed during the punishment phase of the appellant's trial.

The cases from other jurisdictions do not persuade us that our analysis of the factors pursuant to Rule 403 is wrong. Having found that the trial court abused its discretion, we must perform a harm analysis.

The appropriate standard of harm is found in Rule of Appellate Procedure 44.2(b). In *Johnson v. State*,[23] we explained that "[a] criminal conviction should not be overturned for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect."[24]

■ The State argues that admission of the photograph was harmless because the photograph was cumulative of evidence already presented to the jury. The jury knew that Paula was pregnant when she was killed and had heard a description of the unborn child. Also, the State explains only one photograph was introduced. Hence, the State concludes that the photograph could not have improperly influenced the jury. But the State's response to the appellant's objection at trial seems to contradict this conclusion:

> Appellant: Well, State's Exhibit ... 68 is—has absolutely no relevance or materiality to any issue sought to give proof by the State of Texas. There's not any problem with identity in this trial. There's already been a picture introduced, two pictures actually, a morgue photo as well as a wedding photo. This is absolutely—the only reason this is being admitted—introduced, Your Honor, is to whip the jury into a death penalty frenzy and, you know, that—its inflammatory and prejudicial nature outweighs the pro-

---

**18.** 132 Ohio App.3d 69, 724 N.E.2d 477 (1 Dist.), *appeal not allowed,* 85 Ohio St.3d 1477, 709 N.E.2d 849 (1999).

**19.** 919 S.W.2d 69 (Tenn.Crim.App.1995).

**20.** *Alfieri,* 724 N.E.2d at 482; *Williamson,* 919 S.W.2d at 74–75.

**21.** 707 So.2d 547 (Miss.1997).

**22.** *Id.* at 594.

**23.** 967 S.W.2d 410 (Tex.Crim.App.1998).

**24.** *Id.* at 417.

bative value if you decided to—that there is any probative value, which you cannot because there is none. Then—I mean *this is strictly, Your Honor, to inflame and prejudice the jury and get them to answer Special Issues One and Two in such a way that Mr. Reese will die.*

State: *Well, as a matter of fact, that is true.* However, it is based on fact. The State must prove that the defendant is a future danger. There is no better evidence that the defendant is a future danger than the fact that he is willing to shoot and kill not only a young woman but also cause the death of that fetus.[25]

The State's trial counsel seems to admit that the photograph was intended to inflame the jury and influence it to make its decision on an improper basis.

Moreover, we find it significant that, although the defendant's conviction in this case is based on the deaths of Paula and Michael Birdow, the State offered only Paula's picture during the punishment phase. In fact, this emotionally charged photograph is the *only photograph* that the State offered during the punishment phase.

The State relies on *Cantu,* in which we found error in the admission of a photograph, but held that the error was harmless. The facts in *Cantu* can be distinguished. The photograph in that case showed a victim of the offense, who had not been included in the indictment, at her sixteenth birthday party.[26] The photograph did not contain an unborn child that had been removed from the mother after death and wrapped in a blanket. This element of the photograph in this case had

more potential to inflame the jury and cause them to make a decision on an improper basis than the photograph in *Cantu.* Also in *Cantu,* we found it relevant that during the punishment phase there were more than thirty witnesses, the testimony filled seven hundred pages of the transcript, and the State did not mention the improperly admitted evidence during closing arguments.[27] During the punishment phase of the instant case, there were only eleven witnesses that gave testimony that filled one hundred ninety-three pages. The photograph at issue was the only photograph admitted during punishment, and the State used and emphasized this photograph during closing arguments. Almost immediately before the jury started deliberations, the State argued:

The defendant, Raymond Reese is mean and vindictive and heartless. He has shown you that through his actions throughout his entire life. He turned on the people who loved him. *He turned on an unborn child.* ... *Trevon[28] didn't get to celebrate his first birthday.* ... He didn't give Paula a chance. *He didn't give Trevon a chance.*[29]

The State sent the jury into deliberations thinking about Paula's unborn child. Given the record before us, we have no fair assurance that the error did not influence the jury, or had but a slight effect. The appellant's third point of error is sustained.

■ The appellant also challenges the legal sufficiency of the evidence to support the jury's finding of future dangerousness.[30] We review the evidence from the guilt and punishment phases of the trial "in the light most favorable to the verdict

25. Ct.R. vol. XXXII, at 130–132 (emphasis added).

26. *Cantu,* 939 S.W.2d at 636.

27. *Id.* at 637–38.

28. Trevon is the name that the victim's family gave to the unborn child.

29. Ct.R. vol. XXXIII, at 50 (emphasis added).

30. The future dangerousness special issue asks jurors "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071 § 2(b)(1).

to determine whether a rational trier of fact could have found the elements of Art. 37.071(2)(b) [31] beyond a reasonable doubt." [32] In *Keeton,* we outlined eight factors that the jury may consider in determining whether the defendant poses "a continuing threat of violence to society." We said that the factors include, but are not limited to:

(1) the circumstances of the capital offense, including the defendant's state of mind and whether he was acting alone or with other parties;

(2) the calculated nature of the defendant's acts;

(3) the forethought and deliberateness exhibited by the crime's execution;

(4) the existence of a prior criminal record and the severity of the prior crimes;

(5) the defendant's age and personal circumstances at the time of the offense;

(6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

(7) psychiatric evidence; and

(8) character evidence. [33]

The appellant argues that these factors weigh in his favor. We will review the evidence admitted during both phases of the trial.

The evidence at trial indicates that the appellant and Barbara had been living together for about thirteen years. At some point during those years the relationship deteriorated, and they began to argue frequently. On the day before the offense while the appellant was at work, he and Barbara argued on the telephone. Barbara told the appellant that he would need to move out of the apartment they shared by the end of the month.

That evening Barbara went to a school program; she was gone from 6:00 p.m. until 10:00 p.m. When she returned, the appellant was drinking a beer on their porch, which was enclosed by a fence. Barbara told the appellant that she was going to a club. About one-half hour after she arrived, the appellant showed up at the bar. They stayed away from each other while they were there. Barbara asked the appellant to give her a ride back to the apartment. On the way home, they had another argument. They were verbally abusive to each other, but did not strike one another. During the argument, the appellant told Barbara that he was going to have sex with her that night.

At about 11:00 p.m. they returned to the apartment complex. Barbara jumped out of the car before it came to a stop, and she ran to Paula and Michael's apartment across the street. Barbara told them that she wanted to get the appellant out of the apartment. Barbara, Paula, and Michael went across the street to the apartment where the appellant was. Barbara yelled at the appellant, told him to leave, and told him that she was going to call the police. The appellant went into the kitchen and grabbed a butcher knife. He moved toward Barbara with the knife in his hand. Paula ran to call the police. The appellant set the knife down, ran after Paula, and pulled the phone out of her hands.

The appellant went outside the apartment. Barbara, Paula, and Michael followed him. Barbara almost had the gate shut when the appellant and Paula began arguing. The appellant slapped Paula. Then Michael grabbed the appellant around the waist, and the two men struggled. Michael released the appellant, who ran back into the apartment. Michael, Paula, and Barbara followed him back into the apartment. The appellant ran toward

---

**31.** The future dangerousness instruction is now article 37.071 section 2(b)(1).

**32.** *See Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Crim.App.1987).

**33.** *Id.*

the bedroom, followed by Michael, Paula, and Barbara.

The appellant found a gun in the bedroom and shot Michael and then shot Paula. Barbara ran out of the apartment; the appellant pursued her. When the appellant caught up with Barbara, he hit her with the gun, and the bullet that was fired from the gun grazed her head.

Around 1:00 a.m., an off-duty police officer who lived in the apartment complex heard the gunshots and called 911. After calling 911, he went to the parking lot. The officer saw the appellant raise the gun to Barbara's head and pull the trigger. Then the appellant left the scene.

Some time later, the appellant called out to a police officer on his way to the scene. The appellant voluntarily surrendered to the officer.

According to the medical examiner, Michael's wound indicated that the gun was at least twenty-four inches from the victim. Paula's wound indicated that the gun was about one-and-one-half inches away from the victim.

The appellant did not offer any evidence during the guilt-innocence phase of the trial. The trial court gave an instruction on self-defense in the jury charge.

During the punishment phase, the State introduced two prior convictions. The first was a conviction for robbery when the appellant was sixteen years old. The second was a conviction for attempted possession of a deadly weapon.[34] No other convictions were admitted at the trial. The appellant was forty-eight years old when he committed the instant offense.

The State introduced evidence of uncharged misconduct during the guilt-innocence phase and during the punishment phase. Barbara testified that the appellant had given her a black eye some years before the murders. Barbara's other daughter testified that the appellant hit her once while the appellant and Barbara were having an argument. There was evidence that on another occasion an officer had visited the appellant's home because of a complaint of a domestic dispute. At that time Barbara told the officer that the appellant had threatened her.

There was testimony that, during the two years the appellant was awaiting trial for this offense, he committed no rule violations. The appellant's sister and maternal uncle testified, and they both said that the appellant was not a violent person. Neither relative had met Barbara. The appellant's sister had been living in Atlanta, Georgia, from 1985 until 1998. The appellant's uncle testified that he had never been to the appellant's home.

The appellant analyzes the first three *Keeton* factors together. He argues that these factors weigh in his favor because the offense was not planned long in advance, the victims were not killed in an especially brutal manner, and the offense was committed while he was intoxicated and agitated.

But the jury may have considered the fact that the victims were particularly vulnerable. The jurors may have assumed that the appellant knew that Paula was pregnant and that Michael suffered from asthma. The testimony was that Michael struggled with the appellant only to get him away from Paula. Also, the victims were not the primary target of the appellant's anger. The appellant had been having an argument with his girlfriend, who enlisted the help of the victims to get the appellant to leave the apartment. The appellant started to leave the apartment before the killing, but then went back inside. According to the testimony, the appellant was the only one to brandish a weapon that night.[35] After killing Michael

---

34. The robbery and attempted possession of a deadly weapon offenses were committed in New York.

35. There were questions at trial about a second knife missing from the butcher block in the kitchen, but there was no testimony that a knife had been used against the appellant.

and Paula, he chased Barbara and tried to kill her, too. He shot at Barbara though she pleaded with him not to shoot her. After he turned himself in, he became violent again. While sitting in the police car, he beat his head against the partition and kicked the car window.

The appellant argues that the fourth *Keeton* factor weighs in his favor because his prior convictions were more than twenty years old, ignoring the fact that his uncharged misconduct indicates an escalating pattern of violence. While living with Barbara, he threatened her life and the lives of her children. The testimony at trial indicated that the appellant assaulted Barbara twice and her daughter once. On the night of the murders, the appellant made threats again, assaulted Paula, then killed Michael and Paula and tried to kill Barbara. Also, the appellant became violent in the police car after surrendering to the police.

 The appellant claims that the fifth factor also weighs in his favor because he was forty-eight at the time of the offense, he was embroiled in a domestic dispute, and he had no disciplinary problems while in jail awaiting trial. The jury may view the appellant's age as mitigating or aggravating. Also the jury was not required to give mitigating weight to the fact that the murders took place in the context of a long-term domestic dispute. Jurors were entitled to view as aggravating circumstances the fact that the appellant would try to kill his girlfriend he had lived with for thirteen years and would kill her pregnant daughter and her daughter's husband. The jury was not required to view the appellant's pretrial jail behavior as mitigating. The appellant was indicted for capital murder; it was in his best interest to behave well while in jail awaiting trial.

Because he was under duress from domestic problems that were exacerbated by the verbal abuse from Paula and the physi-

cal attack by Michael, the appellant argues that the sixth factor weighs in his favor. The testimony at trial indicates that the appellant became violent first by assaulting Paula. Michael grabbed the appellant to prevent him from hurting Paula.

The appellant also argues that the victims pursued him into the bedroom where he found the gun and shot Michael and Paula. He chose to remain at the apartment while the argument spiraled out of control. Therefore, the jury may have found that the stressful situation was caused, at least in part, by the appellant's own conduct.

 The appellant finds it significant that the State did not offer any psychiatric evidence, relevant to the seventh factor. We do not require the State to produce psychiatric evidence to prove future dangerousness.[36] This fact alone does not compel the jury to find that the appellant will not constitute a future danger to society.

The appellant argues that the State offered no character evidence during the punishment phase. During both stages of the trial, the evidence admitted showed, through the acts of the appellant, that he had the capacity to commit acts of violence in the future. The State did not need to produce a witness to summarize for the jurors what they had heard for themselves.

After viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational jury could find that there is a probability that the appellant would commit criminal acts of violence in the future. The appellant's first point of error is overruled.

The appellant's conviction is affirmed. The sentence is vacated, and the case is remanded to the trial court for a new punishment hearing.

MANSFIELD, J., filed a dissenting opinion.

36. *Matamoros v. State,* 901 S.W.2d 470, 474 (Tex.Cr.App.1995).

KELLER, J., filed a dissenting opinion in which McCORMICK, P.J., and KEASLER, J., joined.

MANSFIELD, J., delivered a dissenting opinion.

Dr. Harminder Narula of the Harris County Medical Examiner's Office testified at trial that the victim named in the indictment, Paula Birdow, was approximately six months pregnant at the time she was killed by the appellant. Dr. Narula testified further her unborn child was viable, meaning he could have lived outside the womb. Testimony at trial showed appellant knew the victim was pregnant when he killed her. Accordingly, I believe the jury was entitled to see the photograph of her unborn child, such evidence being both relevant and probative in the context of both special issues. I respectfully dissent.

KELLER, J., delivered a dissenting opinion in which McCORMICK, P.J., and KEASLER, J., joined.

It is an old but true cliche that a picture is worth a thousand words. Our caselaw reflects that truism: generally, photographs are admissible if verbal testimony about the matters depicted in the photographs would be admissible.[1] Visual evidence can be highly probative, even if the visual evidence simply corroborates what has already been presented through verbal testimony.[2]

The first question, then, is whether the matters depicted in the contested photograph were a proper subject of testimony in the punishment phase of this capital murder prosecution. The photo showed Paula and her unborn child, both fully clothed,[3] lying side-by-side in a casket. Most of the Court's argument focuses on the unborn child's presence in the photograph.

The Court contends that "the death of the fetus was not a fact of consequence related to an issue in dispute."[4] Because this contention is wrong, the Court's Rule 403 analysis is flawed from the outset.

Article 37.071 permits the introduction of any evidence relevant to the special issues.[5] Violent "bad acts" constitute relevant punishment evidence if they tend to show future dangerousness or reflect upon the defendant's moral culpability.[6] And such bad acts need not be against people to qualify for consideration. We have held that the fact that a defendant brutally killed even a dog[7] or cats[8] against the owners' wishes is relevant to the special issues and admissible at punishment. When a defendant causes the death of an unborn child against the prospective parents' wishes, the defendant has committed

---

1. *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim.App.1997).

2. *Chamberlain v. State*, 998 S.W.2d 230, 236–237 (Tex.Crim.App.1999).

3. The fetus was wrapped in what appears to be a blanket.

4. Op. at 242.

5. Texas Code of Criminal Procedure, Article 37.071 § 2(a); *see also* §§ 2(b) & (e). The future dangerousness issue asks: "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071, § 2(b)(1).

 The mitigation issue asks:

 Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

 Texas Code of Criminal Procedure, Article 37.071, § 2(e)(1).

6. *See Cooks v. State*, 844 S.W.2d 697, 734 (Tex.Crim.App.1992)(angry outbursts initiated by the defendant).

7. *Willingham v. State*, 897 S.W.2d 351, 355 (Tex.Crim.App.1995); *Johnson v. State*, 853 S.W.2d 527, 532 (Tex.Crim.App.1992).

8. *Emery v. State*, 881 S.W.2d 702, 706 (Tex. Crim.App.1994).

a violent bad act. In such a case, the unborn child's death is a circumstance relevant to the jury's assessment of the special issues, and the State should be allowed to prove and argue that circumstance to the jury. For that reason, depiction of the unborn child's death was not, in itself, a basis for declaring the photograph in this case to be *unfairly* prejudicial.

Prejudice caused by the fact that appellant killed Paula's unborn baby was fair, not unfair, and should not be weighed against the State in a Rule 403 analysis.

So, the Court is mistaken when it suggests that unfair prejudice occurs because the "unborn child in the photograph appears tiny, innocent, and vulnerable [and][s]ociety's natural inclination is to protect the innocent and vulnerable." [9] That appellant terminated the life of an innocent and vulnerable member of society is a perfectly legitimate point for the State to make. That appellant would terminate a life so innocent and vulnerable shows just how dangerous and morally blameworthy he is.

In its harm analysis, the Court contends that the State "seems to admit" that the photo was intended to influence the jury to make its decision on an improper basis. The State made no such admission. The full context of the conversation shows that the State argued that the photograph was relevant under the special issues:

> [DEFENSE COUNSEL]: Then—I mean this is strictly, Your Honor, to inflame and prejudice the jury and get them to answer the Special Issues One and Two in such a way that Mr. Reese will die.
>
> [PROSECUTOR]: Well, as a matter of fact that is true. However, it is based on fact. The State must prove that the defendant is a future danger. There is no better evidence to show that the defendant is a future danger than the fact that he is willing to shoot and kill not only a young woman but also cause the death of that fetus.
>
> The testimony has already been admitted, therefore you ruled that the facts involved in this photograph are admissible. The photograph is in good taste. We didn't attempt to introduce a photograph of the bloody fetus in her stomach. We chose to admit a photograph that is in good taste that shows the results of the defendant's handiwork and there is nothing that is so prejudicial that outweighs the probative value to show that he is in fact a future danger because if he will do an act that is going to be—be something that results in the death of something like that then he will do anything and I believe it is highly probative.
>
> [DEFENSE COUNSEL]: It's also cumulative and repetitious. Whatever she is trying to bring to this jury is already in their minds. There is no question.
>
> THE COURT: They do have to make a decision on this. What I am wondering is if this brings to them a sense of— sense of what the man has done and they want to pass on that in order to make the proper verdict.
>
> [PROSECUTOR]: That is exactly right.

The State was making a polemical point in its response: of course the photograph was intended to prejudice the jury and spur it to answer the special issues in the State's favor; the State's argument was that prejudice produced was not unfair but legitimate.[10] Immediately following this colloquy, the trial court made the point:

> THE COURT: Are we a society gone so soft that we can have a trial of this and yet not have the jury confront the effect of the dead on which it is passing judgment?

A photograph of the dead unborn child conveys nothing more than the full effect of appellant's actions.

---

9. Op. at 242.

10. *See Montgomery,* 810 S.W.2d at 378.

The Court also presents a "slippery slope" argument. If the evidence in the present case is admissible, the Court asks whether an ultrasound picture of a three-month-old fetus would be admissible or whether a fetus' picture would be admissible if the fetus were killed in a traffic accident. But appellant was not a stranger who killed a woman who happened to be pregnant, nor was the death in the present case an accidental one. Appellant knew Paula, knew she was pregnant, and the jury could infer from the familial relationship that appellant knew that Paula and her husband were looking forward to having this child.[11] Despite appellant's knowledge of the specific circumstances surrounding Paula's pregnancy, he intentionally chose to end her life and that of her unborn child. Perhaps there are hypothetical situations in which a fetus' death might be so unforeseeable that a person should not be saddled with the impact that death might have on the jury's assessment of punishment. But that is not the case before us.

The final question is whether unfair prejudice was generated in the present case by the *manner* in which the unborn child's death was depicted. Three significant aspects of the photo reflect the manner of depiction: the unborn child was (1) shown apart from the mother outside the womb, (2) dressed in clothing, and (3) lying in a casket. Finding no Texas authority regarding the significance of these facts, I have conducted some research in other jurisdictions to help in determining whether these facts should be considered decisive in the Rule 403 balance. In *State v. Alfieri*, an Ohio court of appeals evaluated a photograph of a dead fetus.[12] The defendant in that case was convicted of aggravated vehicular homicide for causing the unlawful termination of a pregnancy.[13] At the guilt stage of trial, a photograph of the fetus was admitted into evidence.[14] The photograph depicted the "fetus, fully clothed in a knitted cap and long gown; no portion of the fetus's body, with the exception [of] its face and hands, are visible in the photograph and no outward signs of physical injury are apparent."[15] The Court of Appeals concluded that the trial court did not abuse its discretion under Ohio's version of Rule 403 in admitting the photograph because: "(1) only one photograph was introduced into evidence, (2) the photograph was not unduly gruesome, and (3) it was probative of a material fact (that the pregnancy was terminated as a result of the collision) and was illustrative of medical testimony on that issue."[16]

In *State v. Williamson*, the Tennessee Court of Criminal Appeals addressed the admissibility of a similar photograph.[17] The defendant was charged with vehicular homicide resulting in the death of a viable fetus.[18] The court found that the photograph was relevant to establish the viability of the fetus, an element of the offense that was contested at trial.[19] In rejecting the defendant's contention that a doctor's testimony and a photograph of the fetus were unfairly prejudicial under Tennessee's version of Rule 403, the court described the photograph as follows: "The photograph of the infant victim was not

---

11. Evidence at trial showed that this would have been Michael's first child and that he was especially excited about the child's coming birth.

12. *State v. Alfieri*, 132 Ohio App.3d 69, 724 N.E.2d 477, 486–487 (1 Dist.1998), *appeal not allowed*, 85 Ohio St.3d 1477, 709 N.E.2d 849 (1999).

13. *Id.* at 480.

14. *Id.* at 486.

15. *Id.* (bracketed material added).

16. *Id.* at 487.

17. *State v. Williamson*, 919 S.W.2d 69, 78–79 (Tenn.Crim.App.1995).

18. *Id.* at 79.

19. *Id.*

gruesome. The infant was fully clothed and the eyes of the infant were shut." [20]

The present case is analogous to *Alfieri* and *Williamson*. In each of the latter two cases, the evidence concerning the fetus was relevant to an element of the offense charged. The photograph in each case was considered admissible even though the government possessed and introduced other relevant non-photographic testimony to prove the same facts. Although the death and viability of Paula's unborn child were not elements of the capital murder offense in the present case, those facts were relevant to both the future dangerousness and mitigation special issues. And the photograph in the present case had characteristics similar to those discussed in the two out-of-state cases: the photograph was not gruesome, it did not show any injuries, and the fetus was fully clothed with only the face exposed and eyes closed. Finally, as in *Alfieri*, the State in the present case introduced only one photograph of the fetus.

The only potentially significant difference between the photograph in the present case and those in *Alfieri* and *Williamson* is that the photograph in this case showed the fetus in a casket lying beside his dead mother. My research has uncovered two cases involving photographs of caskets although neither involved a dead fetus. In *Beckwith v. State*, the defendant was charged with murder, and the State introduced into evidence in the guilt phase of trial two photographs, taken at two different funerals, of the victim's body in a casket.[21] The defense stipulated to the identity of the deceased and objected to the introduction of the photographs on rel-

evance grounds.[22] The trial court overruled the defense objection and admitted the photographs into evidence.[23] On appeal, the defendant argued that the photographs had no probative value after the defense stipulated to the victim's identity, and the defendant argued that the photographs "served only to inflame and prejudice the jury and create sympathy for the victim and his family." [24] The Mississippi Supreme Court held that the photographs were relevant to show the circumstances of the killing and the corpus delicti, and that "[a]lthough unpleasant, as are any photographs of a murder victim's body, the photographs were not so gruesome or used in such a way as to be overly prejudicial or inflammatory." [25]

The other case uncovered by our research is *Kane Furniture Corp. v. Miranda*, an appeal in a civil wrongful death action.[26] The photo of a casket was part of a very emotional slide presentation, depicting: "the Mirandas' wedding; a daughter's graduation; Christmas; family birthday celebrations; visits to Disney World and SeaEscape; and decedent's casket." [27] Detailed testimony was also presented by four witnesses about the good-natured disposition of the decedent, the loving family relationship of the Mirandas, and the family's reaction to the decedent's death.[28] The Florida Court of Appeals found that the "presentation was so prejudicial as to have deprived Kane of a fair trial." [29]

The present case is more similar to *Beckwith* than to *Kane*. As in *Beckwith*, the photograph in the present case is a photograph of the bodies inside the casket. The photograph's relevance is derived from its portrayal of the bodies. In *Kane*,

20. *Id.*

21. *Beckwith v. State*, 707 So.2d 547, 593 (Miss.1997).

22. *Id.*

23. *Id.*

24. *Id.*

25. *Id.* at 594.

26. 506 So.2d 1061 (Fla.App. 2 Dist.1987)

27. *Id.* at 1067.

28. *Id.*

29. *Id.*

however, the casket was apparently shown for its own sake, and it was shown as part of what was at best a marginally relevant depiction of significant events in the deceased's life.

And the photograph in the present case was the *only* photograph depicting the unborn child. Appellant has not given us any reason to believe that the State possessed any other photographs of the fetus, much less an alternative photograph picturing the fetus without the casket or omitting some other detail appellant finds objectionable.

After viewing the photograph in the present case, and reviewing holdings in other jurisdictions, I am persuaded that the trial court did not err in determining that the photograph was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice. Appellant knew Paula was pregnant at the time he shot her, and the photograph, while of significant emotional import, really just illustrates the logical and foreseeable consequences of appellant's actions. The image of the fetus was relevant to help the jury visualize the circumstances of the crime by helping them understand and visualize what stage of pregnancy Paula was in. The photograph showed the enormity of what appellant did, gave the jury a sense of the kind of harm appellant inflicted upon the victims, and showed the kind of person appellant would have to be to commit such a crime. Because the photograph was the only evidence containing the unborn child's image, the State's need for it was high. And because the State introduced only one photograph of this nature, the photo did not require much of the State's time to present.

From a Rule 403 perspective, this is a hard case. But trial courts are usually given deference on the hard cases, and that should occur here. I would hold that the trial court did not abuse its discretion in admitting the photograph.