**Affirmed and Memorandum Opinion filed November 5, 2024.**



In The

# Fourteenth Court of Appeals

### NO. 14-23-00465-CR

**JENISE LEANN SPRUIELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 268th District Court**
**Fort Bend County, Texas**
**Trial Court Cause No. 20-DCR-093101**

## M E M O R A N D U M   O P I N I O N

A jury found Appellant Jenise Leann Spruiell guilty of murder and assessed punishment at 22 years' confinement. Appellant appeals her conviction and asserts (1) the evidence is legally insufficient to establish that Appellant was a party to the charged offense, and (2) the trial court abused its discretion by admitting certain evidence. For the reasons below, we overrule Appellant's issues on appeal and affirm the trial court's judgment.

BACKGROUND

On November 11, 2019, officers with the Stafford Police Department were dispatched to reports of a shooting at a La Quinta hotel located on the Southwest Freeway. When officers arrived, they found Complainant lying face-down in the parking lot with multiple gunshot wounds. Complainant was pronounced dead at the scene.

Appellant was arrested approximately one year later and charged with Complainant's murder. Appellant proceeded to a jury trial in May 2023. At trial, the State alleged that Appellant was guilty of the charged offense under the law of parties, which imposes criminal responsibility for the conduct of other persons if the defendant (1) acts with the intent to promote or assist in the commission of the offense, and (2) solicits, encourages, directs, aids, or attempts to aid the others committing the offense. *See* Tex. Penal Code Ann. § 7.02.

The jury heard testimony from eight witnesses. We excerpt relevant portions of their testimonies below.

### Officer McDougle

Officer McDougle was one of the Stafford Police Department officers who responded to the reports of Complainant's shooting. According to Officer McDougle, upon arriving to the hotel parking lot he "observed a black male lying on the ground." Officer McDougle also recalled seeing "several shell casings around his body."

Officer McDougle said there were no witnesses to the shooting. However, a guest at the hotel reported hearing "approximately 8 to 10 gunshots" from his hotel room, which overlooked the parking lot. The witness also reported seeing "a black 4-door car blacked out in the parking lot and that it left and he didn't see a license

plate on it."

### *Officer Stout*

Officer Stout is a crime scene investigator with the Stafford Police Department and responded to the reports of Complainant's shooting. During Officer Stout's testimony, the trial court admitted into evidence photographs showing Complainant's body in the hotel parking lot. Officer Stout said Complainant was found holding in his hand "a cell phone that had sustained damage from a bullet." Officer Stout also said 13 firearm shell casings were collected from the crime scene. Additional testing of the shell casings did not yield any fingerprints.

During her investigation, Officer Stout examined the hotel room Complainant had been staying in before he was shot. According to Officer Stout, in the hotel room she found (1) bail bond paperwork with Complainant's name on it, (2) an AK47 firearm "located in the folding bed that was near the door," and (3) "a box of Monarch 40 Smith & Wesson ammo." Officer Stout said the spent shell casings collected from the parking lot did not match either the firearm or the ammunition recovered from Complainant's room.

### *Officer Combs*

Officer Combs is an investigator with the Houston Police Department. At trial, Officer Combs testified about a shooting that had occurred ten days before Complainant's murder.

According to Officer Combs, he responded to reports of a shooting on November 1, 2019. Officer Combs said Michael Daniel had been shot in the neck and was transported to the hospital. Officer Combs testified that there were no eyewitnesses to Daniel's shooting. Officer Combs said he was unable to obtain a

phone number for Daniel but received one for Daniel's mother. Officer Combs said he called Daniel's mother the day after the shooting and for several days thereafter, but she did not return his calls.

Officer Combs said he subsequently received a phone call from an officer with the Fort Bend Independent School District Police Department who had information about Daniel's shooting. After receiving this information, Officer Combs said Complainant was developed as a suspect in Daniel's shooting.

Officer Combs said he continued to investigate Daniel's shooting and discovered that Daniel was released from the hospital on November 6th. Officer Combs testified that he made repeated attempts to contact Daniel and his mother. According to Officer Combs, Daniel's mother "finally agreed to set up a meeting" and, on December 4, 2019, Officer Combs met with Daniel and his mother in a restaurant parking lot. Officer Combs said he did not find Daniel to be a credible witness and therefore "inactivated his case."

### Detective Melendez

Detective Melendez is employed by the Stafford Police Department and was the lead detective assigned to investigate Complainant's murder. Detective Melendez responded to the La Quinta the night of the shooting and made contact with three people who also had been staying in Complainant's hotel room. Detective Melendez stated that these individuals provided her with Complainant's Instagram username. Detective Melendez said it is "useful" to have a person's Instagram username when investigating a crime because it "gives us kind of a timeline, depending on how active they are on the account, of where they were, what time they last posted, [and] who they might have been corresponding with."

Detective Melendez said she also reviewed the hotel's parking lot

surveillance camera footage, which showed the shooting. Detective Melendez testified that the footage showed that Complainant was speaking on the phone shortly before he was shot.

Detective Melendez said she received a call the day after the shooting from a woman who identified herself as Complainant's girlfriend. According to Detective Melendez, Complainant's girlfriend provided Complainant's Instagram username — the same username that also was provided by the occupants of his hotel room. Detective Melendez testified that she also learned from Complainant's girlfriend "about an incident where [Complainant] confessed to [his girlfriend] that he had recently been involved with killing a man." Detective Melendez said the Stafford Police Department then contacted the Houston Police Department, from whom they received information regarding Michael Daniel's shooting on November 1, 2019.

Continuing to describe the course of her investigation, Detective Melendez said she pulled the records for the phone Complainant was found with at the time of his death as well as the records for his Instagram account. Detective Melendez testified that Complainant and Daniel had communicated on Instagram on November 1, 2019 — the day Daniel was shot. Detective Melendez said Complainant also had exchanged messages with Appellant beginning on November 4th, 2019, with their communications ending on November 11th — the day Complainant was shot. Describing Appellant's connection to Daniel, Detective Melendez said Appellant has a child with Daniel's half-brother.

Turning to Complainant's phone records, Detective Melendez said the last call received on his phone came through at 11:11 p.m. the night he was shot. According to the La Quinta's surveillance camera footage, Complainant was shot in the parking lot approximately two-to-four minutes later, while he was still

5

talking on his phone. Detective Melendez said the phone number that called Complainant was traced to a "burner phone," which she described as a phone purchased with cash that "cannot be traced" and requires no identifying information to operate. Detective Melendez said these phones "are used a lot in criminal enterprises" because "of the anonymity behind it." According to Detective Melendez, the burner phone that called Complainant was activated the day of the shooting and was not used after the shooting.

Detective Melendez testified that police received a tip implicating Appellant in Complainant's death. Detective Melendez said subsequent cell phone testing was able to place several phone numbers at or near the La Quinta close to the time Complainant was shot, including the burner phone and phone numbers belonging to Appellant and Michael Daniel's younger sister, Kiya Daniel.

### Detective Tyler

Detective Tyler worked at the Stafford Police Department and also was assigned to investigate Complainant's death. Describing the nature of the investigation, Detective Tyler testified:

> This was not a straightforward case, by any means. We got pieces of information over many, many months, and in some cases years, that we had to build on each — build on each individual piece, and then link them together through our investigative process.

During Detective Tyler's testimony, the State offered and the trial court admitted into evidence the video surveillance footage from the La Quinta parking lot surveillance cameras. Detective Tyler said this footage shows the movements of two cars: a blue Chevrolet Malibu (which he termed the "scout car") and a silver Chevrolet Impala (which he termed the "shooter car").

Detective Tyler began by describing the footage that captured Complainant's

6

shooting. Detective Tyler said the blue scout car could be seen pulling into a parking space near the front of the La Quinta, "with no lights illuminated." The Complainant is shown walking towards the scout car when the silver shooter car "comes speeding around from the bottom-left area of the screen." Continuing to describe the footage, Detective Tyler said:

> [Complainant] starts running towards that area, trying to run past the approaching car. And you see an individual exit the shooter car from the driver's side, run after [Complainant] with his arm extended, and [Complainant] falls, and you see the gentleman or the person who exited that vehicle stand over [Complainant] and fire several shots.
> . . .
> That person then runs back to the shooter vehicle, and that vehicle leaves out towards Techniplex [Drive].
> The scout vehicle then backs up, drives past the down body of [Complainant], and exits towards the freeway.

Detective Tyler said the cameras show that Complainant was shot at approximately 11:15 p.m.

The State then offered into evidence additional surveillance camera footage from cameras at the rear of the hotel. According to Detective Tyler, this footage shows the scout car and shooter car stop at the same point and "a person exit[ing] the scout vehicle and enter[ing] the shooter vehicle" at approximately 11:07 p.m. — eight minutes before the shooting. Detective Tyler said other hotel surveillance cameras also showed the scout car and the shooter car at various points minutes before the shooting. Describing the cars' movements, Detective Tyler said the vehicles appeared to be "circling the hotel" about 10-15 minutes before the shooting.

Detective Tyler also reviewed surveillance camera footage from the hotel's entrance, which showed Complainant exiting the hotel at 11:13 p.m. "holding what

7

appears to be a cell phone that's lit up." Shortly thereafter, the footage shows that Complainant "appears [to be] looking around the parking lot and speaking into the cell phone, as if he's on the phone looking for someone." Complainant is shot approximately two minutes later.

Also admitted into evidence was surveillance camera footage from the IHOP restaurant located next to the La Quinta. The admitted footage was from the restaurant's rear camera that faces towards the hotel's front doors and shows the scout car's movements approximately five minutes before the shooting. Describing this footage, Detective Tyler said it shows the scout car "enter into the IHOP parking lot, pull into a parking space for a short time," then reverse out of the parking space "a short time later." Detective Tyler said the footage did not show the scout car's license plate; rather, the scout car had a "temporary paper registration" that was "flapping in the wind."

While the scout car is parked, the footage shows the driver "appeared to have an object at their ear consistent with the motion of talking on a cell phone, and then that object is brought down, almost as if they were looking at a cell phone." When the scout car exits the parking space, a still photograph of the driver is captured and zoomed in on. Describing the photograph, Detective Tyler said it shows a female with shoulder-length hair and a pink top. Detective Tyler testified that, based on the photograph and the findings of his investigation, he believed Appellant was the person pictured in the photograph.

Continuing to describe the course of his investigation, Detective Tyler said officers received a Crime Stoppers tip implicating Appellant in Complainant's murder. Detective Tyler said officers received another tip linking Complainant's murder to "a shooting [that] had occurred . . . approximately ten days prior to this offense."

8

With respect to the prior shooting, Detective Tyler said he received an offense report from the Houston Police Department regarding the November 1, 2019 shooting of Michael Daniel that listed Complainant as a suspect. Detective Tyler said he reviewed Complainant's cell phone and Instagram records and found that Complainant had communicated with Daniel shortly before the November 1st shooting. According to Detective Tyler, Instagram messages showed that Daniel was planning to buy a gun from Complainant on November 1st.

Detective Tyler said he also met with Appellant during the course of his investigation and informed her that he was looking into Complainant's murder. Describing Appellant as "evasive," Detective Tyler said he showed her a picture of Complainant but she did not acknowledge knowing him. Detective Tyler subsequently obtained the records for Appellant's phone number as well as her Instagram account.

Reviewing the records associated with Appellant's phone number, Detective Tyler said a contact entry was created on November 2, 2019 (the day after Daniel's shooting) for Complainant's phone number with the name "GET EM OUT OF HERE COACH." Detective Tyler said Appellant's Instagram account records also showed that she and Complainant had exchanged approximately 300 messages between November 4 and November 11, 2019. The messages were flirtatious in nature, with Complainant repeatedly requesting Appellant's cell phone number and to schedule a meet up.

On the day of Complainant's murder, he made plans on Instagram to meet with Appellant. Complainant again asked for Appellant's cell phone number and, at one point, messaged her to say "[a]ll this instagram shit u scared to give me your number." At 8:50 p.m., Appellant sent Complainant an Instagram message that said, "I text you."

9

According to Detective Tyler, "not even two minutes before that was the very first instance from the burner phone of a text message to the Complainant." Detective Tyler said the burner phone number was activated the day of the shooting and had not previously contacted Complainant's phone. Detective Tyler said the burner phone number also was "the last number that was — that successfully communicated with [Complainant] before he was shot."

Detective Tyler said authorities were able to access the burner phone's AT&T activation records. These records showed that contact was made with AT&T at 8:43 p.m. the night of the shooting because service on the burner phone was not working. The phone number listed in AT&T's activation notes was registered to Michael Daniel's mother.

Finally, Detective Tyler testified regarding the location data collected for the cell phone numbers suspected to be involved in Complainant's shooting. Shortly before the shooting, Detective Tyler said the records showed that Appellant's phone number had repeated contacts with a phone number associated with Michael Daniel's sister, Kiya. Detective Tyler said these phones' communications were processed through the same cell phone tower, which was located less than one mile north of the crime scene. Detective Tyler testified that he "did not observe that tower anywhere else in the [cell phone] records."

### Collista Franklin

Collista Franklin works for a residential property management company and previously oversaw the community that Michael Daniel's family resided in. Franklin recalled that Daniel's mother lived in a home with Daniel and several other adult children. Franklin was shown a picture of a silver Impala (the same type of car involved in Complainant's shooting) and asked if she recognized it as one associated with the Daniels family. Franklin responded "yes" and said she

previously had spoken to Daniel's mother regarding the vehicle.

### *Agent Shaw*

Finally, the jury heard from FBI Agent Shaw regarding his analyses on call detail records from phone numbers implicated in Complainant's shooting. Agent Shaw explained that he used the call detail records in conjunction with cell phone towers "to determine the approximate location of these cellular devices, relative to the date and time and location in which the homicide occurred."

Cell tower activations were shown for the night of Complainant's shooting from 10:13 p.m. to 10:22 p.m. These records show the burner phone and Kiya's phone pinged the same cell phone towers during the same time frame. The burner phone made three outgoing phone calls to Complainant's phone. Kiya's phone records showed two phone calls with a cell phone number registered to Daniel's mother.

Cell tower activations for the burner phone show it had two calls with Complainant's phone at 11:07 and 11:12 p.m. the night of the shooting, both of which pinged to cell phone towers located near the crime scene. Cell tower activations for Appellant's phone show it also had communications that pinged cell phone towers near the crime scene the night of the shooting during the same time frame. Specifically, the records registered six phone calls between Appellant's and Kiya's phones between 11:08 and 11:17 p.m. Finally, cell tower activation records for Kiya's phone also show substantial activity that registered to cell towers located near the crime scene at the time of the shooting.

### *Conclusion of Trial*

After the parties rested, the jury retired to deliberate and returned a verdict finding Appellant guilty of murder under the law of parties. *See* Tex. Penal Code

Ann. §§ 7.01, 7.02, 19.02(b)(1). The jury assessed punishment at 22 years' confinement. Appellant timely filed this appeal.

ANALYSIS

In two issues on appeal, Appellant asserts:

1. the evidence is legally insufficient to support her conviction for murder under the law of parties; and

2. the trial court abused its discretion by admitting Officer Combs' testimony.

We consider these issues individually below.

## I. Evidentiary Sufficiency

### A. Standard of Review and Governing Law

In assessing sufficiency of the evidence in a criminal case, we view all the evidence presented at trial in the light most favorable to the jury's verdict and determine, based on that evidence and any reasonable inferences that may be drawn therefrom, whether any rational factfinder could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). We may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the factfinder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Id*.

We consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from that evidence. *See Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016). Circumstantial evidence is as probative as direct evidence in establishing an actor's guilt, and circumstantial

12

evidence alone can be sufficient to establish guilt. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Not every fact or piece of evidence needs to point directly to a defendant's guilt, so long as the cumulative force of all evidence supports the conviction. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021). We look to the "events occurring before, during[,] and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Id*.

We measure the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). As relevant here, a person commits murder if the person "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(1), (2). A person acts "intentionally" with respect to the result of her conduct when it is her conscious objective or desire to cause the result. *Id*. § 6.03(a). A person acts "knowingly" with respect to the result of her conduct when she is aware that her conduct reasonably is certain to cause the result. *Id*. § 6.03(b).

The trial court also instructed the jury on the law of parties under Texas Penal Code section 7.02. Under this section, "[a] person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, [s]he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id*. § 7.02(a)(2).

"Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement." *Salinas v. State*, 163 S.W.3d 734, 739 (Tex. Crim. App. 2005). "However, mere presence of a person at the scene of a

13

crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012).

## B. Application

We agree with Detective Tyler's characterization of this case as "not a straightforward" one. But viewed in the light most favorable to the verdict, the evidence and the reasonable inferences that may be drawn therefrom nonetheless are legally sufficient to support Appellant's conviction for murder under the law of parties. *See* Tex. Penal Code Ann. §§ 7.01, 7.02, 19.02(b).

Considered together, the evidence shows as follows:

- Complainant was shot numerous times in a La Quinta parking lot at approximately 11:15 p.m. on November 11, 2019.

- Complainant was talking on his phone as he exited the hotel at 11:13 p.m. Complainant appeared to be "looking around the parking lot . . . as if he's on the phone looking for someone."

- Two vehicles were involved in the shooting: a blue "scout car" and a silver "shooter car." Shortly before the shooting, the scout car pulled into a hotel parking space with no lights on and Complainant began walking towards it. As Complainant was walking towards the scout car, the shooter car drove towards him. An individual exited the shooter car and shot Complainant several times, after which both vehicles exited the parking lot.

- Surveillance footage showed the vehicles "circling" the hotel about 10-15 minutes before the shooting. At one point, the vehicles parked together and a person exited the scout car and entered the shooter car.

- Surveillance footage from the adjacent IHOP showed the scout car park in a parking space several minutes before the shooting. The driver of the scout car appeared to be on the phone. A still photograph from the video footage shows the scout car was driven by a female with shoulder-length hair and a pink top.

- Reviewing the still photograph from the IHOP surveillance footage,

14

Detective Tyler said he believed the woman pictured was Appellant.

- Franklin testified that the Daniels family previously had owned a silver car similar to that involved in the shooting.

- Police officers received a tip linking Complainant to Michael Daniel's shooting on November 1, 2019. Complainant and Daniel had communicated days before Daniel's shooting, with Daniel planning to buy a gun from Complainant.

- Before his death, Complainant told his girlfriend "that he had recently been involved with killing a man."

- A Crime Stoppers tip implicated Appellant in Complainant's murder. Appellant has a baby with Michael Daniel's half-brother.

- While investigating Complainant's murder, Detective Tyler met with Appellant and found her "evasive." Detective Tyler showed Appellant a picture of Complainant and she denied knowing him.

- But despite professing not to know Complainant, evidence showed that Appellant previously had substantial interactions with him.

- On November 2, 2019, Appellant created a contact entry in her cell phone for Complainant's phone number with the name "GET EM OUT OF HERE COACH."

- Appellant exchanged approximately 300 messages with Complainant on Instagram between November 4 and November 11, 2019. These messages were flirtatious in nature, with Complainant repeatedly requesting Appellant's cell phone number and to schedule a meet up. There were no messages after the day Complainant was shot.

- Appellant and Complainant made plans to meet on November 11, 2019. At 8:50 p.m., Appellant sent Complainant an Instagram message that said "I text you." According to Detective Tyler, "not even two minutes before that [Instagram message] was the very first instance from the burner phone of a text message to the Complainant."

- The burner phone number was "the last number that was — that successfully communicated with [Complainant] before he was shot."

- The burner phone was activated the day of Complainant's murder. The burner phone's activation records show that contact was made with AT&T at 8:43 p.m. the night of the shooting because service on the phone was not working. A phone number listed in the activation

notes was registered to Michael Daniel's mother.

- The night of the murder, cell phone tower activation records for the burner phone show it pinged the same towers as the phone belonging to Kiya Daniel, Michael Daniel's younger sister.

- Cell phone tower activation records show the phone numbers belonging to the burner phone, Appellant, and Kiya Daniel all pinged the same cellular towers located near the crime scene at the time of the shooting.

Taken together, the cumulative force of this evidence is legally sufficient to support Appellant's conviction for Complainant's murder. Specifically, it shows that Appellant, with the intent to promote or assist in the commission of the offense, encouraged or aided another person with respect to the shooting of Complainant. *See* Tex. Penal Code Ann. §§ 7.01, 7.02, 19.02(b).

We overrule Appellant's first issue.

## II.    Admission of Officer Combs' Testimony

In her second issue, Appellant asserts the trial court erred in admitting Officer Combs' testimony because it was irrelevant and its probative value was substantially outweighed by the danger of unfair prejudice.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009). A trial court abuses its discretion only if its decision is so clearly wrong and unjust as to lie outside the zone within which reasonable people might disagree. *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008).

Under Texas Rule of Evidence 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Stone*

16

*v. State*, 635 S.W.3d 763, 770 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd). Evidence is "unfairly" prejudicial if it tends to suggest an improper basis for reaching a decision. *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000).

As set out above, Officer Combs testified about his investigation into the November 1, 2019 shooting of Michael Daniel. In her appellate brief, Appellant argues Officer Combs' testimony was irrelevant because Daniel was not charged in Complainant's death and any testimony about Daniel was mere speculation. We disagree.

Texas Code of Criminal Procedure article 38.36 provides as follows with respect to evidence in prosecutions for murder:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

Tex. Code Crim. Proc. Ann. art. 383.6(a). Officer Combs' testimony fits well within these parameters. As discussed above in our analysis of Appellant's first issue, the State's theory at trial posited that Appellant was involved in a plan to kill Complainant as revenge for Complainant's involvement in Michael Daniel's shooting. Therefore, Officer Combs' testimony regarding his investigation into Daniel's shooting and the development of Complainant as a suspect is relevant to show the "facts and circumstances surrounding" the murder of Complainant. *See id*. The trial court did not abuse its discretion by admitting Officer Combs' testimony.

We overrule Appellant's second issue.

## CONCLUSION

We affirm the trial court's judgment.

/s/ Meagan Hassan
   Justice

Panel consists of Chief Justice Christopher and Justices Wise and Hassan.

Do Not Publish — Tex. R. App. P. 47.2(b).