

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-11-00548-CR

La-John **GABRIEL**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 144th Judicial District Court, Bexar County, Texas
Trial Court No. 2010CR8558
Honorable Angus McGinty, Judge Presiding

Opinion by:    Catherine Stone, Chief Justice

Sitting:    Catherine Stone, Chief Justice
            Sandee Bryan Marion, Justice
            Rebecca Simmons, Justice

Delivered and Filed:  December 31, 2012

AFFIRMED

A jury found La-John Gabriel guilty of murder and assessed a sentence of ninety-nine years in prison.  On appeal, Gabriel challenges the trial court's denial of his motion to suppress multiple statements made to law enforcement officials.  Gabriel also asserts the trial court erred when it admitted, over objection, certain crime scene photos.  We overrule Gabriel's points of error and affirm the trial court's judgment.

## BACKGROUND

On June 30, 2010, Khristopher Jones was found shot to death on an outside stairway of the apartment building where he lived. Gabriel was determined to be a person of interest, and officers made contact with him outside of a different apartment building where he lived with his mother. The officers informed Gabriel they were investigating a homicide, and they asked Gabriel if he would agree to go to the police station to speak with a detective. Gabriel agreed. Officers drove Gabriel and his mother to the station, and Gabriel spoke with Detective Salame. After the interview, an officer drove Gabriel and his mother home. Based on statements Gabriel made during the interview, Detective Salame acquired probable cause to arrest Gabriel for murder and obtained a warrant for Gabriel's arrest. Gabriel was arrested and taken back to the station. After arriving at the station, Detective Salame spoke to Gabriel a second time. During this interview, Gabriel made more incriminating admissions before invoking his right to counsel. Due to Gabriel's invocation of his right to counsel, the interview was terminated.

Gabriel was arraigned and subsequently indicted for murder. Prior to trial, Gabriel filed two motions to suppress his statements. Following a hearing, the trial court denied the motions to suppress, with a few minor exceptions. The jury found Gabriel guilty of murder, and he was sentenced to ninety-nine years in prison.

## ADMISSIBILITY OF THE STATEMENTS

### A. Facts

On June 30, 2010, in response to a call reporting gunshots being fired, officers were dispatched to the apartment complex where Jones was shot to death. Detectives Jesse Salame, a detective for the Homicide Unit of the San Antonio Police Department (SAPD), and John Schiller, a detective with the Gang Unit of the SAPD, were assigned to investigate the case and reported to the crime scene. Although no witnesses to the shooting could be located, Detective

Salame was able to develop several persons of interest, including Gabriel. At this point, Detective Salame did not have a prime suspect. On July 1, 2010, Detective Salame provided Detective Schiller with the names of the persons of interest he had developed, and he asked Detective Schiller to locate these men, gather information about them, and ask them if they were willing to go to the police station to talk with Detective Salame. Detective Salame told Detective Schiller he only wanted to talk to these individuals and made it clear there was not probable cause for an arrest.

Officers Joseph Garza (J. Garza), Marco Garza (M. Garza), and Mark Molter were members of the Gang Unit who assisted in the investigation. They discovered that Gabriel frequented the Nob Hill apartment complex and then drove around the area of these apartments attempting to locate the persons of interest. After canvassing the area, some officers parked in the Nob Hill complex in hopes of spotting Gabriel.

Subsequently, a dark-colored SUV that fit the description of a vehicle associated with Gabriel arrived at the complex and parked near the building where officers believed Gabriel lived. After the vehicle was parked, Officer J. Garza approached the occupants and questioned them about Gabriel's whereabouts. The driver, Casaundra Grant, told the officers she was there to pick up Gabriel. Both Grant and the other occupant had active warrants and were arrested on unrelated charges.

Not long after the SUV arrived, a white truck drove up and parked in front of the building where Gabriel was thought to live. Immediately, Officers Molter and M. Garza approached the truck and looked inside. Officer M. Garza recognized Gabriel in the backseat of the truck and signaled this to Officer J. Garza, who had come over to the truck to assist. Gabriel was drinking a beer and, because the officers knew Gabriel was nineteen years old, the officers knew he was a minor in possession. There is conflicting testimony about what happened next. Officer M.

Garza testified that Officer J. Garza opened the door and grabbed Gabriel, while Officer J. Garza testified that he asked Gabriel to exit the vehicle. Gabriel was then subjected to a pat-down search, handcuffed, and detained for being a minor in possession.

Detective Schiller was conducting surveillance at the Nob Hill apartment complex that evening. After the dark-colored SUV pulled up, Detective Schiller made contact with Gabriel's mother, Erica Gabriel, who was walking near the SUV. Detective Schiller never approached either vehicle. Gabriel's mother appeared intoxicated but cooperated with officers. After Gabriel was identified and handcuffed, a couple of officers walked him to where Detective Schiller was standing. Detective Schiller spoke with the officers and learned that Gabriel was handcuffed and detained for a minor in possession; Gabriel was never placed under arrest. After learning this information, Detective Schiller instructed the officers to remove the handcuffs and then told Gabriel a homicide detective wanted to talk to him at the police station downtown. Gabriel was informed that he did not have to go to the police station. Nevertheless, Gabriel agreed to go downtown to speak to Detective Salame, and Officer Molter drove Gabriel there. Another officer also took Gabriel's mother downtown to be with Gabriel. Gabriel was not in handcuffs during the ride to the police station. During the suppression hearing, Detective Schilling testified that Gabriel did not appear to be under the influence of drugs or alcohol. Detective Schiller also testified that if Gabriel had declined to go downtown, he would have released Gabriel because he did not have probable cause for an arrest.

### B. *Gabriel's First Interview*

Around 2:50 a.m., Gabriel arrived at the police station and was placed in an interview room equipped with a recording device. Shortly thereafter, Detective Salame entered the room and began talking with Gabriel. Gabriel indicated that he was handcuffed earlier, but that the officers had removed the handcuffs. Gabriel was not in handcuffs during the interview. At the

outset, Detective Salame told Gabriel that he was not under arrest and was free to leave. Detective Salame also told Gabriel that he was there voluntarily, and Gabriel asked what that meant. Detective Salame explained that it meant Gabriel had come to the station house on his own and would leave on his own. Gabriel replied, "No, I didn't come on my own, [the officers] drove me." Detective Salame then reaffirmed that Gabriel was not under arrest and could leave anytime, and Gabriel acknowledged understanding this. During the interview, Detective Salame told Gabriel that he was free to leave several more times. In fact, Detective Salame promised Gabriel that no matter what he said, he would be taken home after the interview.

Because Gabriel was not under arrest, Detective Salame did not warn Gabriel of his rights prior to beginning the interview. About ten minutes into the interview, however, Gabriel said he knew the police were looking for him, but he did not realize the police "were going to come take [him] for questioning." Detective Salame stated, "You didn't have to come," and Gabriel responded, "You['re] right, sir." Seconds later, however, Gabriel claimed, "But the police say I had to come or I was gonna be detained or some shit like that." Detective Salame asked, "They said you had to come?" and Gabriel responded, "Yeah, they said I had to come." Detective Salame stopped the interview and, out of caution, warned Gabriel of his rights. After reading Gabriel his rights, Detective Salame asked, "Do you understand these rights?" Gabriel stated he did, but then asked, "What [does] that mean?" Detective Salame responded that he believed Gabriel felt as though he was under arrest so he wanted to warn him of his rights, and Gabriel stated "I'm not under arrest." Detective Salame then asked if he understood his rights, and Gabriel said yes. The two continued conversing for almost thirty more minutes. After the interview concluded, Gabriel and his mother were taken home.

After the interview had finished and while waiting for the police car to arrive to escort Gabriel and his mother home, Officer M. Garza accompanied Gabriel outside the back of the

police station, for security purposes, so Gabriel could smoke a cigarette. Gabriel was not detained or handcuffed. While standing with Officer M. Garza, Gabriel began rambling "that he had to put the guy down because that's just what he had to do." Officer M. Garza testified he never initiated any conversation with or posed any questions to Gabriel. After Gabriel finished smoking two cigarettes, Officer Molter drove Gabriel and his mother back to their apartment.

### C. Gabriel's Second Interview

During the first interview, Gabriel made incriminating statements that supplied Detective Salame with probable cause to arrest Gabriel for Jones's murder. Detective Salame obtained an arrest warrant, and around 5:30 a.m. Gabriel was arrested at his home and brought back to the police station. Upon his arrival at the police station, Gabriel was again placed in an interview room equipped with a recording device. Unlike his first visit to the stationhouse, Gabriel was handcuffed. Also unlike the previous interview, Detective Salame began this interview by informing Gabriel that he was under arrest and warning Gabriel of his rights.

When Detective Salame entered the interview room, Gabriel immediately told Detective Salame he was tired. After being read his rights and asked if he understood, Gabriel said he did not understand them and asked that they be read again. Detective Salame warned Gabriel of his rights again, this time more slowly. After being warned the second time, Gabriel stated that he understood his rights. Detective Salame testified that Gabriel appeared coherent during the interview, although there were a few instances during the questioning when Gabriel appeared confused.[1] At one point during this interview, Detective Salame asked Gabriel what he did with the gun, and Gabriel responded that he threw it in the woods. In an attempt to determine the exact location of the gun, Detective Salame told Gabriel that he would be charged with

---

[1] This confusion is evident from the videotaped interview, which was admitted at trial and incorporated into the appellate record.

additional offenses if the gun was found and used to kill someone else. After about twenty-eight minutes of talking with Detective Salame, Gabriel invoked his right to counsel. The trial court ruled that the remainder of Gabriel's statement was inadmissible

After the second interview was terminated, Officers Tim Esp and Molter transported Gabriel from the police station to the magistrate's office to be arraigned. While in the patrol car, Gabriel spontaneously commented that he gave the gun to his "homeboy" Ray. Neither officer had initiated a conversation with Gabriel or asked Gabriel any questions regarding his spontaneous admission. Officer Esp specifically remembered Gabriel's statement because he recognized the name Ray. Officer Esp had spoken to an individual named Ray Anderson the previous night, and Anderson had acknowledged knowing Gabriel. After taking Gabriel to the magistrate's office, the officers contacted Anderson and obtained the gun from his residence.

### D. Standard of Review

We review the trial court's ruling on a motion to suppress under a bifurcated standard. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (en banc). We defer to the trial court's determinations on historical facts supported by the record, especially when they are based on credibility assessments, and mixed questions of law and fact that turn on credibility evaluations. *State v. Iduarte*, 268 S.W.3d 544, 548 (Tex. Crim. App. 2008); *Guzman*, 955 S.W.2d at 89. We review de novo mixed questions of law and fact not turning on credibility assessments and purely legal questions. *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011); *Carmouche*, 10 S.W.3d at 327. Viewing the evidence in the light most favorable to the trial court's ruling, the ruling will be upheld if it is supported by the record and correct under any theory of law applicable to the case. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000) (en banc).

### E. Was Gabriel in Custody During the First Interview?

Gabriel contends the statements made in his first interview with Detective Salame were inadmissible because they were a product of custodial interrogation made without proper warnings. The trial court admitted Gabriel's statements made during the first interview, finding that the statements were voluntarily made and not the product of custodial interrogation.

Every person has the right to be free from compelled self-incrimination. U.S. CONST. amend. V, XIV; *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007). To protect this right, the individual must be warned of his constitutional and statutory rights prior to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 442–57, 467–79 (1966); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(a)(2) (West 2005); *Contreras v. State*, 312 S.W.3d 566, 582 (Tex. Crim. App. 2010). In order for a subsequent statement to be admissible in the prosecution's case-in-chief, the individual also must have knowingly, intelligently, and voluntarily waived his rights. *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2261 (2010); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(a)(2); *Herrera*, 241 S.W.3d at 525. Additionally, Texas law requires oral statements made during custodial interrogation to be electronically recorded. TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(a)(1). These requirements apply only if the individual was in custody at the time of the questioning.

An individual is in custody "if, under the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with a formal arrest." *Herrera*, 241 S.W.3d at 525 (quoting *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1995)) (internal quotation marks omitted); *see also California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam). "The 'reasonable person' standard presupposes an *innocent* person." *Dowthitt*, 931 S.W.2d at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)). A custody determination is made by looking at a totality of the circumstances. *Stansbury v. California*, 511

U.S. 318, 322 (1994) (per curiam). However, only objective circumstances of the interaction are considered, unless an officer manifests his subjective intentions to the individual. *Id.* at 323–25; *Dowthitt*, 931 S.W.2d at 254.

The Supreme Court has announced a two-part inquiry for determining whether an individual is in custody for purposes of *Miranda*. *See Howes v. Fields*, 132 S. Ct. 1181, 1189–90 (2012). First, we must decide whether a "reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)) (internal quotation marks omitted). If we answer in the affirmative, we must next consider "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

The Texas Court of Criminal Appeals has identified a nonexclusive list of four situations that may result in a restriction of one's freedom sufficient to place a person in custody:

(1) when the suspect is physically deprived of his freedom of action in any significant way[;]

(2) when a law enforcement officer tells the suspect that he cannot leave[;]

(3) when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted[;] and

(4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

*Dowthitt*, 931 S.W.2d at 255 (citing *Shiflet v. State*, 732 S.W.2d 622, 629 (Tex. Crim. App. 1985) (en banc)). The fourth situation does not apply in this case, and the first three situations involve restricting freedom of movement to the degree associated with a formal arrest. *Id.* Although Gabriel was handcuffed and detained immediately before speaking with Detective Schilling, at the time Gabriel was asked if he was willing to speak with a homicide detective, Gabriel was not in handcuffs. There were, however, two officers standing by while he spoke

with a third officer, Detective Schilling. During this discussion, Detective Schilling expressly told Gabriel that he did not have to go downtown. Gabriel stated that he was willing to go downtown, and he was escorted in a patrol vehicle, free of restraints, by an officer. During the interview, Gabriel was never placed in handcuffs and was repeatedly advised that he was not under arrest and was free to leave. In fact, Detective Salame promised Gabriel that he would be taken home after the interview, regardless of what Gabriel said. During the interview, Gabriel made conflicting statements about his custodial status, once indicating that he was told he had to come to the police station, but multiple times affirming that he was not under arrest.

The third situation presented in *Dowthitt v. State* is the only custodial situation that might apply under these circumstances. *Dowthitt*, 931 S.W.2d at 255. To help determine whether a reasonable person in Gabriel's position would have believed his freedom of movement was restrained to the degree associated with a formal arrest, we must consider: (1) the location of the questioning; (2) its duration; (3) statements made during the interview; (4) whether the individual was restrained during the questioning; and (5) whether the individual was released after the questioning. *Howes*, 132 S. Ct. at 1189 (citations omitted).

As to the first consideration, the location of the interview at the station house weighs in favor of a custodial finding. The third factor listed above is neutral since Gabriel indicated he did not feel his presence was voluntary while also acknowledging, multiple times, that he was not under arrest. Both Detective Schilling and Detective Salame expressly advised Gabriel that he was not under arrest, not obligated to speak with police, and free to leave. In light of these circumstances, the trial court reasonably could have given weight to either position.

However, three of the considerations mentioned above unquestionably weigh in favor of a noncustodial interview. The interview lasted about thirty minutes, far short of the length of interrogations the Court of Criminal Appeals has held to be inherently coercive. *See Dowthitt*,

931 S.W.2d at 257.  Additionally, Gabriel was not restrained at the time he was asked to go downtown to speak with a homicide detective or during his interview with Detective Salame. Although Gabriel had previously been restrained, the detectives made it abundantly clear that Gabriel was free to leave, thereby removing any taint of the previous detention.  Also of importance to a finding of a noncustodial interaction is the fact that Gabriel was taken home after his interview.  Another circumstance weighing in favor of a noncustodial finding is the fact that Gabriel's mother was allowed to accompany him to the police station.

Because the trial court is in the best position to judge witness credibility and to make factual assessments, we cannot say the trial court abused its discretion in ruling that Gabriel was not in custody during his first interview with Detective Salame.  *See Herrera*, 241 S.W.3d at 526–27.  Gabriel was involved in a noncustodial interview and, thus, was not entitled to the procedural safeguards required for custodial interrogation.  *Miranda*, 384 U.S. at 477; TEX. CODE CRIM. PROC. ANN. art. 38.22 § 5.

Gabriel also claims his statement made in Officer J. Garza's presence that he "put the guy down" was fruit of the poisonous tree and would not have been made but for his illegal custody. The trial court concluded, however, that this statement was "not in response to questioning by the police," but instead, was voluntarily made.  Voluntary statements are admissible whether or not the individual was in custody at the time of the statement.  TEX. CODE CRIM. PROC. ANN. art. 38.22 § 5; *Dossett v. State*, 216 S.W.3d 7, 24 (Tex. App—San Antonio 2006, pet. ref'd).

### F.  Did Gabriel Waive His Rights During the Second Interview?

Gabriel argues his statement during the second interview was involuntary because he did not understand the warnings and because he was coerced by Detective Salame's statement that he could be charged with additional offenses if his gun was found and used in another crime. The trial court admitted the contents of Gabriel's second recorded statement prior to his

invocation of the right to counsel. The court determined that although Gabriel was in custody, he "knowingly, intelligently, and voluntarily waived his rights." The court also concluded that Gabriel was given and acknowledged all of the warnings required by Article 38.22.

The State bears the burden of establishing a knowing, intelligent, and voluntary waiver of a defendant's rights under *Miranda* and Article 38.22. *Miranda*, 384 U.S. at 475; *Leza*, 351 S.W.3d at 349, 351; *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). Waiver must be proven by a preponderance of the evidence. *Miranda*, 384 U.S. at 475; *Leza*, 351 S.W.3d at 349, 351; *Joseph*, 309 S.W.3d at 24. In determining whether there was a valid waiver of Gabriel's rights, we must look to the totality of the circumstances, "including the background, experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374–75 (1979); *see Leza*, 351 S.W.3d at 349, 352–353; *Joseph*, 309 S.W.3d at 25.

The United States Supreme Court has announced "two distinct dimensions" of the waiver inquiry. First, "waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Berghuis*, 130 S. Ct. at 2260 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Second, a waiver is valid only if it is "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Burbine*, 475 U.S. at 421) (internal quotation marks omitted).

Gabriel contends he did not understand the warnings provided and, as a result, did not voluntarily waive his rights. When Detective Salame first entered the interview room, Gabriel immediately complained that he was tired, to which Detective Salame responded that he was also tired. Next, and prior to any questioning, Detective Salame advised Gabriel of his rights. After reading these rights the first time, Gabriel stated that he did not understand what they meant. Consequently, Detective Salame read these rights to Gabriel again more slowly and, as he did so,

Gabriel leaned in and focused more closely on what was being said. After the second, slower warning, Gabriel acknowledged understanding his rights, and he proceeded to answer Detective Salame's questions.

During the suppression hearing, Gabriel's mother testified that she told some of the officers that Gabriel was "mentally insane" and "mentally retarded" before Gabriel was taken to the police station for the first interview. However, none of the officers testified that this was communicated to them. Moreover, a mental evaluation of Gabriel was never performed, and there is no other evidence in the record to support this assertion. Because the trial court is in the best position to evaluate a witness's credibility, the trial court could have properly disbelieved the testimony of Gabriel's mother.

On appeal, Gabriel's counsel asks us to recognize, based on the recorded interviews, that Gabriel's behavior "indicated that something was amiss" and that he was "slow-witted," pointing specifically to Gabriel's difficulty recalling who he was with the night of the crime and the fact that he counted using his fingers. This argument, however, was never presented to the trial court. At the suppression hearing, multiple officers testified that Gabriel seemed competent and was acting normally. Additionally, the videos show Gabriel frequently changing his answers to Detective Salame's questions after Detective Salame indicated that he could prove Gabriel's answer was inaccurate. Gabriel's vacillating answers could be interpreted as his struggle to determine which people to name without placing himself at the scene of the crime. At the same time, Gabriel could genuinely have been confused and had trouble answering relatively simple questions. Regardless, the trial court was in the best position to make any determination on whether Gabriel's intelligence affected his ability to understand his rights, and because this argument was not raised in the trial court, we decline to address it. *See* TEX. R. APP. P. 33.1; *Ross*, 32 S.W.3d at 855–57.

Similarly, the video of the second interview does not indicate that Gabriel failed to understand the warnings after being advised of them a second time. In contrast, his invocation of his right to counsel suggests that he did understand the warnings and, indeed, chose to assert a right he was informed he had. Furthermore, the fact that Gabriel told Detective Salame that he did not understand the warnings after hearing them the first time and wished to have them read again indicates that Gabriel was not opposed to asking for clarification when needed. Accordingly, when Gabriel acknowledged understanding his rights after a second, slower reading to which he was more attuned, the trial court could have determined that Gabriel truly did understand. The trial court's determination that Gabriel understood his rights and knowingly, intelligently, and voluntarily waived them is not outside the zone of reasonable disagreement.

Gabriel also claims that his statement that he gave the gun to his homeboy Ray was the product of coercion. The Court of Criminal Appeals has declared that some types of misrepresentations by police during interrogations may constitute coercion. *Green v. State*, 934 S.W.2d 92, 99–100 (Tex. Crim. App. 1996). The key is whether, under the totality of the circumstances, the statement by police was "such as to overbear the will of the accused and bring about a confession not freely determined." *Id.* at 99–100. Other factors considered in *Green* include: (1) whether the misrepresentation implicated extrinsic considerations that could be the basis of an irrational choice to confess; (2) whether the misrepresentation would cause doubt as to the reliability of the confession or cause even an innocent person to confess; (3) age and intelligence; (4) experience with the criminal justice system; and (5) the fact that *Miranda* warnings were given multiple times.

Here, Detective Salame informed Gabriel that if someone found the gun he claimed to have tossed in the woods, he would be charged for any crimes committed with it. Unlike the

statements of concern in *Green*, this statement by Detective Salame is likely not a misrepresentation. Moreover, although Detective Salame's warning may have introduced an extrinsic consideration beyond Gabriel's guilt or innocence in Jones's murder, it is not the type that would cause an innocent person to confess falsely (especially since an innocent person would probably not know where the gun was located), nor was it so coercive that it overbore Gabriel's will to confess to the gun's location. This latter reason is demonstrated by Gabriel's behavior itself. Gabriel did not immediately respond when Detective Salame discussed possible future charges, but instead waited until he was in the patrol car on the way to the magistrate's office. This shows that Gabriel made the statement only after consideration of the possible consequences of not confessing; such careful deliberation is the opposite of overbearing one's will.

Additionally, Gabriel was nineteen and there was no evidence that he was not of average intelligence other than his mother's claim. The record also indicates Gabriel had been brought downtown for questioning in an unrelated crime only a few months before Jones's murder. As such, Gabriel likely did not feel the same anxiety and compulsion to respond as would someone who had no prior interactions with detectives. Moreover, as previously noted, Gabriel was warned of his rights twice before the interrogation began to ensure his understanding. He was also warned of his rights during his first interview only hours earlier. All of these factors suggest the statement at issue was not the result of coercion.

Like Gabriel's statement, "I had to put the guy down," the trial court ruled Gabriel's statement that he gave Ray the gun was not in response to questioning and was voluntarily made. Again, the trial court was in the best position to judge the witness's demeanor and, based on the record, we cannot say the trial court abused its discretion in admitting this statement.

## ADMISSIBILITY OF THE PHOTOGRAPHS

Gabriel complains that the probative value of nine crime scene photographs admitted into evidence by the State is substantially outweighed by unfair prejudice under Texas Rule of Evidence 403. Specifically, Gabriel asserts: (1) the photos "are gruesome color photos of the body, including close-ups with two showing pubic hair"; (2) the photos were unnecessarily duplicative of the autopsy photos, other photos that were not objected to, and testimony by police officers; and (3) the photos were unnecessary to explain cause of death or to rebut a defensive theory of the case.

### A. *Standard of Review*

"The admissibility of a photograph is within the sound discretion of the trial judge." *Shuffield v. State*, 189 S.W.3d 782, 786 (Tex. Crim. App. 2006); *Prible v. State*, 175 S.W.3d 724, 734 (Tex. Crim. App. 2005). Under an abuse of discretion standard, we must determine whether the trial court's ruling was so arbitrary that it is outside the zone of reasonable disagreement. *Casey v. State*, 215 S.W.3d 870, 878 (Tex. Crim. App. 2007). An appellate court should "do more than decide whether the trial judge did in fact conduct the required balancing between probative and prejudicial values; 'the trial court's determination must be reasonable in view of all relevant facts.'" *Shuffield*, 189 S.W.3d at 787 (quoting *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997)); *Reese v. State*, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000).

### B. *Rule 403—Was the Probative Value of the Crime Scene Photographs Substantially Outweighed by the Danger of Unfair Prejudice?*

The nine photos in dispute, State's exhibits 31–39, are crime scene photos that depict Jones's body as it was found at the scene, as well as close-up photos of Jones's wounds. All of the photographs were presented in color, and in all of the photos Jones is without a shirt. Photo 31 is a full body shot of Jones on the stairs as he was found, covered in blood and brain matter

with a cell phone in his hand. Photo 32 is simply a picture of Jones's feet dangling on the stairwell. Photos 33–34 are taken from farther away and show Jones's body slumped on the stairway; blood is not readily apparent. Photos 35–39 depict different images of each of Jones's wounds, some closer than others. In two of these photos, Jones's pants have been partially pulled down to show the wound to his abdomen, thus revealing Jones's pubic hair.

At trial, outside the presence of the jury, Gabriel lodged an objection to the admission of the photos under Rule 403 and as an unnecessarily cumulative presentation of the evidence. The trial court overruled these objections. Gabriel was allowed to object in front of the jury, and he did. This objection was also overruled. We must now determine whether the trial court erred in overruling Gabriel's objections.

Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. Unfair prejudice occurs when evidence provides "an undue tendency to suggest that a decision be made on an improper basis." *Reese*, 33 S.W.3d at 240. Rule 403 favors admission of relevant evidence and, consequently, it carries the presumption that "relevant evidence will be more probative than prejudicial." *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (en banc).

The Court of Criminal Appeals has provided a nonexclusive list of four factors to consider when analyzing a challenge to evidentiary rulings under Rule 403: (1) the probative value of the evidence; (2) the extent that the evidence may "impress the jury in some irrational, but nevertheless indelible way"; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Shuffield*, 189 S.W.3d at 787; *Montgomery*, 810 S.W.2d at 389–90. Additionally, when considering a trial court's ruling on the admissibility of a photo, we

should consider the number of photos, the size of the photo, whether the photo is in color, the detail depicted in the photo, the gruesomeness of the photo, whether the body is naked or clothed, and whether the body had been altered in a way that would be detrimental to the appellant. *Shuffield*, 189 S.W.3d at 787; *Reese*, 33 S.W.3d at 241.

Turning to the four factors considered when examining a Rule 403 challenge, Gabriel concedes the first and third factors weigh in favor of admission. Gabriel admits the photos are probative and needed little time to develop a foundation for introduction. However, Gabriel argues the second and fourth factors weigh in favor of exclusion. First, he asserts the photos "possessed, by their nature, the potential to indelibly insinuate themselves into the minds of the jury with such power as to prevent rational consideration of the case at hand." Although the photos were undoubtedly unpleasant to view, they were an accurate depiction of the crime scene. All evidence offered by an opposing party will inherently be prejudicial, but "unfair prejudice" results when the evidence tends to cause a decision to be based on an improper basis, such as emotion, "without regard to the logical probative force of the evidence." *Casey*, 215 S.W.3d at 879–80, 883. Because the photos were not likely to create an emotional response unrelated to their probative value, we do not believe they impressed the jury in an irrational way.

Next, Gabriel asserts the photos were unnecessary because they were duplicative of other photos and testimony introduced. The Court of Criminal Appeals has rejected the notion that photos accompanying testimony are cumulative of the testimony or without distinct probative value. *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999). "Visual evidence accompanying testimony is most persuasive and often gives the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions" *Id.* In fact, many witnesses testified that Jones was holding a cell phone in his right hand at the time of his death. At least one witness also testified that Jones's left hand was completely covered in blood

and that this would not have been the case if Jones had been holding a weapon at the time he was shot. The State used these facts to rebut Gabriel's claim that he shot Jones because Jones was reaching for something that Gabriel thought was a gun. The photographs showing a cell phone in Jones's right hand and blood covering his left hand corroborate the witnesses' testimony and allowed the jury to fully understand the details of the crime scene upon which police based their conclusions. Because the photos were highly probative and likely did help the jury understand the assertions and evidence offered at trial, they were not cumulative of other evidence. For the same reasons discussed above, Gabriel's argument that the photos were not necessary to rebut a defensive theory also fails.

Additionally, the fact that Jones's pubic hair can be seen in two photos of the gunshot wound to the abdomen does not tip the scale in favor of exclusion. Whether the body is clothed is only one consideration when determining whether unfair prejudice substantially outweighs the probative value of evidence. *See Shuffield*, 189 S.W.3d at 787. Indeed, the Court of Criminal Appeals has many times decided that photos of naked bodies were admissible and that their probative value was not substantially outweighed by their prejudicial effect. *See, e.g.*, *Gallo v. State*, 239 S.W.3d 757, 762–64 (Tex. Crim. App. 2007) (autopsy photographs of an unclothed three-year-old child); *Casey*, 215 S.W.3d at 882–84 (nude, sexually explicit photos of multiple women); *Wyatt v. State*, 23 S.W.3d 18, 29–30 (Tex. Crim. App. 2000) (photos of a child's anus); *Santellan*, 939 S.W.2d 155, 172–73 (Tex. Crim. App. 1997) (autopsy photos of a naked victim's body). In the context of nudity, the photos in this case are far less prejudicial than those in the cases cited. Because the photos did not show Jones's sexual organs and only showed his abdomen to the extent necessary to view the gunshot wound, their prejudicial effect, if any, did not substantially outweigh their probative value.

As a whole, the photos were highly probative evidence that did nothing more than depict the crime scene, and they were unlikely to elicit an irrational decision. *Cf. Reese*, 33 S.W.3d at 240–44 (concluding that the probative value of photos of a murdered woman and her unborn child lying in a coffin was substantially outweighed by unfair prejudice). A trial court does not abuse its discretion simply because it admits gruesome photos. *Paredes v. State*, 129 S.W.3d 530, 540 (Tex. Crim. App. 2004); *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) (en banc). "[W]hen the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence." *Sonnier*, 913 S.W.2d at 519; *see also Chamberlain*, 998 S.W.2d at 237.

## CONCLUSION

For the foregoing reasons, we conclude the trial court did not abuse its discretion in admitting Gabriel's statements or the crime scene photographs. Accordingly, the trial court's judgment is affirmed.

Catherine Stone, Chief Justice

DO NOT PUBLISH