**MODIFY and AFFIRM; Opinion Filed July 21, 2014.**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-13-00182-CR**
**No. 05-13-00183-CR**
**No. 05-13-00184-CR**
**No. 05-13-00185-CR**

**THOMAS EPPELSHEIMER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 6**
**Dallas County, Texas**
**Trial Court Cause Nos. F-11-71623-X, F-11-71319-X, F-11-71624-X, F-11-71625-X**

## MEMORANDUM OPINION

Before Justices Lang, Myers, and Brown
Opinion by Justice Brown

Thomas Eppelsheimer entered an open plea of guilty to the offense of sexual assault of a child in three cases and indecency with a child in a fourth case and executed judicial confessions admitting to the offenses. *See* TEX. PENAL CODE ANN. § 22.011(a)(2)(A) (West 2011); *id.* § 21.11(a). After a bench trial on punishment, the trial court found appellant guilty in all four cases and sentenced him to four consecutive terms of twenty years in prison. The trial court also ordered appellant to pay $594 in court costs in each case. In eight points of error, appellant contends the trial court erred when it admitted certain testimony from one of the State's witnesses and complains the evidence is insufficient to support the trial court's assessment of court costs. In an additional point of error, appellant asserts the judgment in trial court cause number F-11-71319-X should be modified to reflect the correct statute for the offense. We

modify the judgment in cause number F-11-71319-X as requested and affirm that judgment as modified. We affirm the trial court's judgments in cause numbers F-11-71623-X, F-1171624-X, and F-11-71625-X.

## Background

Appellant worked as the promoter of an after-hours rave club called DarkSide. Although the minimum age for admission to the club was seventeen years old, DarkSide's clientele included many underage teenagers. DarkSide was the subject of an undercover narcotics investigation. Through the investigation, undercover officers confirmed that a "wide array" of drugs, including ecstasy tablets, powdered ecstasy (also known as "Molly"), meth, mushrooms, LSD, and ketamine, which is a horse tranquilizer, were being sold and distributed in the club. One undercover officer testified that the use and distribution of the drugs was out in the open such that any club patron could have seen the drug distribution. That officer also testified to a "drug distribution ring" inside the club called the "brotherhood," with whom appellant was involved. He said the narcotics division had intended to investigate the drug distribution occurring at DarkSide for a longer period of time but stopped the investigation after learning about the sexual-assault allegations against appellant.

The complainant in two of the sexual assault cases was H.S., and the complainant in the third sexual assault case and the indecency with a child case was B.L. Both girls were fifteen years old at the time of the offenses.

H.S. testified she started going to DarkSide when she was a freshman in high school. Although she was underage, H.S. said "cute" girls were able to get in to the club. H.S. also had a fake ID that said she was seventeen years old. H.S. described DarkSide as a place to do drugs and that played "electro dance" or techno music. She said the girls wore "go-go outfits," which typically consisted of a bra and underwear or a bikini. H.S. testified that she took ecstasy when

she went to the club, which she obtained from people at the club. H.S. said other drugs were available and that a lot of the "kids" there, most of whom were underage, appeared like they were doing drugs.

H.S. met appellant the first night she went to DarkSide, and she exchanged words with appellant each time she visited the club. But during the summer before her sophomore year of high school, she became "more acquainted" with appellant. She also exchanged text messages with him and sent him pictures of herself, with and without clothes, which appellant persuaded her to send. According to H.S., appellant knew that she was fifteen years old.

During that summer, H.S. invited B.L. and another friend to go to DarkSide. The girls were in summer school together, and they spent a week planning the outing. H.S. and B.L. lied to their parents about spending the night at each other's house so they could go. The plan included going to the club, hanging out at appellant's house, having sex with appellant, and spending the night at his house.

Appellant picked up the girls on a Friday at a local fast-food restaurant and took them back to his house. After they toured appellant's house, B.L. and appellant started "making out" on the bed, and he was touching her; H.S. and the other friend were on the floor making candy bracelets, which they later wore to the club. H.S. eventually joined them on the bed and testified that appellant had sex with both of them. B.L. testified she had taken seven or eight Adderall before arriving at appellant's house and then appellant gave her another drug, which she described as "something more" than Tylenol, for her knee pain. B.L. testified she "was not sober at all" and does not remember much after taking those drugs.

The group later left for DarkSide and arrived with appellant before the club opened. The girls wore go-go attire, but because appellant did not like the "bottoms" of B.L.'s outfit, he took her to his office to find something else for her to wear. B.L. testified the office had a couch,

table, some mirrors, and a bed.  Appellant also had a variety of silk, see-through, and lace panties.  B.L. said appellant picked out some red panties for her and stared at her while she changed, which made her feel uncomfortable.  B.L. testified appellant then told her that she could not leave the office until she had sex with him.  B.L. said she "finally just gave in because [she] couldn't win."  B.L. stated that while she was in the office with appellant she was sobering up from the Adderall and other drug she took earlier in the day.

After the club opened, H.S. said appellant gave her three or four ecstasy tablets to share with B.L. and their other friend.  H.S. and B.L. took the ecstasy tablets.  While on ecstasy, B.L. danced in a cage that was left-over from a topless bar that occupied the building before DarkSide.  B.L. testified that while she was dancing, appellant reached in the cage and touched her "thigh and butt."  Later in the night, appellant also brought the girls water, which H.S. said "wasn't water" and made her sick.  H.S. did not remember much after she drank the water other than going to appellant's office and lying on the bed.  At one point, she recalled seeing his face like he was on top of her; she also felt pressure on her vagina.  B.L. also felt sick after drinking the water.  B.L. testified she threw up in the bathroom but has no memory of what happened after that; her memory was "blank."

The girls woke up Saturday in appellant's bed.  The girls talked about what they thought had happened the night before, concluding that appellant "probably raped" H.S. and B.L.  H.S. testified she "couldn't really remember everything" but she had sperm in her underwear and there was blood.  B.L. testified that when she woke up, she was sore on her thighs, hips, and vaginal area.  B.L. also had dried semen between her legs.  B.L. said appellant told the girls he had a "good night" with them.  B.L. did not remember what happened, and she did not ask appellant what he meant because she "didn't want to know."  Even though the girls were scared about what had happened, they stayed with appellant that day and went to the club again

Saturday night. H.S. had sex with appellant again on Saturday. Appellant drove the girls home on Sunday.

About two weeks later, B.L. told her younger brother what had happened, and B.L.'s brother told their mother, who called the police. B.L. confirmed through text messages with appellant that he had sex with her when she was intoxicated. Neither H.S. nor B.L. saw appellant take any drugs, and to their knowledge, he was completely sober during their sexual encounters.

Dallas police detective Kathy Delapaz investigated the sexual-assault allegations and interviewed B.L. and H.S. She also interviewed appellant, who admitted to having sex with both girls. According to Delapaz, appellant was "adamant" that he had not forced the girls to have sex with him. Delapaz clarified that when she told appellant about the allegations of force being used, she was referring to the fact that something like GHB, the date-rape drug, "might have been in the water" appellant gave the girls. She testified that "when you drug somebody [she] will put that in the force category." Delapaz said appellant acted surprised when she told him the girls were fifteen years old, but she did not believe that he was really surprised by the information.

Through her investigation, Delapaz learned more about DarkSide. Delapaz testified that DarkSide was the kind of place where one could make money beyond selling admission to the event by confiscating drugs off kids that brought drugs to the club and reselling those drugs. She also thought DarkSide was "a source of girls to have sex with on a personal gratification level." She explained that "cute girls dancing" brought people in to the club and also were "a pretty important component because [appellant] was having sex with them."

Delapaz also seized appellant's cell phone and downloaded its contents. She testified to appellant's "very lengthy contact section" that included contacts for H.S. and B.L. Appellant

had a phone number and birthdate for both girls. Delapaz also testified to other contacts in appellant's phone. One contact was for a girl named L.J. Delapaz said appellant's contact information for L.J. included not only the exact dates of his sexual encounters with her in his office at the club but also the fact that he "found out later that she was 16 years old when he had sex with her."

L.J. testified she started going to DarkSide when she was sixteen years old; she used a fake ID to get in the club. She went to DarkSide every weekend so she could do drugs and "party." Because she went to DarkSide so much, she got to know the employees and appellant. L.J. exchanged contact information with appellant and sent him text messages. She also sent appellant naked pictures of herself at his request. L.J. testified she had sex with appellant one time when she slept over at appellant's house. She was sixteen years old then, but she did not report that encounter to the police. L.J. could not remember how many times she had sex with appellant or whether she had sex with him in the office at the club. But she conceded that if appellant said it was true, she would not question it.

L.J. testified that one could buy drugs at DarkSide. She explained that there were "guys walking around all the time that had them, trying to sell them." She also testified that appellant knew that drugs were being sold in the club. L.J. was familiar with the "brotherhood." She said the group was "an easy way to get drugs" and was responsible for dealing drugs in the club. During the time she went to DarkSide, L.J. was "doing a lot of drugs" and that anyone who came into contact with her should have known that she was "visibly high" on drugs most of the time. L.J. further testified to her experiences taking ecstasy and GHB. L.J. said GHB can make you really sick and that it's like "being black-out drunk."

The trial court also heard testimony from three of appellant's friends, each of whom testified they were shocked by the charges against appellant. They said that appellant's divorce

had been difficult and that appellant's behavior changed after the divorce. Appellant's friends confirmed that appellant did not drink or take drugs, and they believed he would be successful on probation.

## Admission of Testimony

Appellant's first four points of error relate to certain testimony from L.J. that the trial court admitted over appellant's objections. Specifically, he contends the trial court erred by allowing L.J. to testify about (1) appellant's knowledge of his employees' activities inside the club (Point of Error One); (2) her sexual encounters with appellant (Point of Error Two); (3) whether she was "visibly high" while on drugs (Point of Error Three); and (4) the physical effects of GHB on a person (Point of Error Four). He claims the State's questions eliciting L.J.'s testimony regarding appellant's knowledge of his employees' activities and L.J.'s memory of her sexual encounters with appellant were nothing more than an attempt to introduce inadmissible extraneous offenses for no other purpose than to show character conformity. He further claims L.J.'s testimony about her personal drug use was speculative and that L.J. was not qualified to testify as an expert about the physical effects of GHB on a person. Appellant maintains the trial court's assessment of four twenty-year consecutive sentences shows that the erroneously-admitted evidence affected his punishment in these cases.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion and will reverse only when the trial court's decision was so clearly wrong as to lie outside the zone of reasonable disagreement. *De La Paz*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009); *Mitchell v. State*, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996). Under article 37.07 of the Texas Code of Criminal Procedure, a trial court has broad discretion to admit evidence the court deems relevant to sentencing, including evidence of prior crimes, reputation, character, or

the circumstances of the offense. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (West Supp. 2013) (permitting the court to admit "any matter the court deems relevant to sentencing").

Of course, we may not reverse a judgment of conviction or punishment for error that does affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b) (non-constitutional error "that does not affect substantial rights must be disregarded"). Substantial rights are not affected if the appellate court, after examining the record as a whole, has "'fair assurance that the error did not influence the jury, or had but a slight effect.'" *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (quoting *Reese v. State*, 33 S.W.3d 238, 243 (Tex. Crim. App. 2000)). When we assess the injurious influence of evidence during punishment, we ask "whether the defendant received a longer sentence as a result of the erroneously admitted evidence." *Rowell v. State*, No. 03-08-00451-CR, 2009 WL 1364351, at *5 (Tex. App.—Austin May 14, 2009, pet. ref'd) (mem. op., not designated for publication). We consider everything in the record, including the other evidence admitted in the case, the nature of the evidence supporting the fact-finder's determination, the character of the alleged error, and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). Further, "in a harm analysis under Rule 44.2(a), 'the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error.'" *Id.* at 357 (quoting *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)).

Here, after considering the whole record in these cases, we conclude that even assuming the trial court erred in permitting L.J. to testify about the matters of which appellant complains, appellant was not harmed by this testimony. *See* TEX. R. APP. P. 44.2(b). First, it is well established that the improper admission of evidence does not constitute reversible error and is "properly deemed harmless" if the same or similar facts are proved by other properly admitted evidence. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999); *Anderson v. State*,

717 S.W.2d 622, 627 (Tex. Crim. App. 1986). Appellant's challenge to the admission of L.J.'s testimony about the employees' activities in the club focuses on the implication that appellant knew of illegal activity in the club. But L.J. specifically testified that appellant knew drugs were being sold in the club because he told her so. And other testimony showed that DarkSide was being investigated for illegal drug activity. L.J. also testified that while she could not remember having sex with appellant in the office at DarkSide, she testified she had sex with him at his house when she was sixteen years old. Delapaz also established in her testimony that information retrieved from appellant's cell phone included the exact dates of his sexual encounters with L.J. in his office as well as the fact that she was sixteen years old at the time. Thus, L.J.'s testimony about appellant's knowledge whether the employees were doing anything in the club that he was not supposed to know about and whether she remembered having sex with appellant at DarkSide was cumulative of other testimony regarding those matters that was admitted without objection. Consequently, the admission of this testimony had no effect on appellant's substantial rights, and any error in admitting this testimony was harmless. *See Anderson*, 717 S.W.2d at 627.

In addition, given all the evidence before the trial court related to the offenses in this case, it is unlikely that the admission of L.J.'s testimony about her own personal drug use or her experience regarding the physical effects of GHB had an effect on the punishments assessed by the trial court. *See Motilla*, 78 S.W.3d at 357. The evidence showed that appellant engaged in sex with both H.S. and B.L. at his house and DarkSide while the girls were under the influence of drugs and he was sober. In particular, the trial court heard how appellant encouraged H.S. to send naked pictures of herself to him, picked H.S. and B.L. up after summer school, took the girls back to his house, had sex with them, and then took the girls to DarkSide even though they

were underage. B.L. had taken Adderall and another drug and did not remember what happened at appellant's house.

At DarkSide, appellant made B.L. change in front of him in his office, had sex with B.L. there, and touched her while she danced. He also gave the girls ecstasy tablets and water that made them sick and pass out. Neither H.S. nor B.L. could remember what happened after drinking the water. But H.S. remembered feeling pressure on her vagina and seeing appellant's face on top of her, and she found semen and blood in her underwear; B.L. was sore in her vaginal area and found dried semen between her legs. Delapaz also told the trial court that DarkSide gave appellant a "source of girls to have sex with," and she testified to the thousands of pages of information she retrieved from appellant's cell phone. The court heard how that information included graphic records of his sexual experiences with "girl after girl after girl after girl," numerous pornographic pictures of girls, and inappropriate text messages between appellant and H.S. and B.L., some of which were read during their cross-examinations. During his interview with Delapaz, appellant also admitted he had sex with H.S. and B.L., and he judicially confessed to each of the charged offenses. The only mitigating evidence appellant presented was the testimony of his three friends, who told the court they were shocked by the charges. But nothing in their testimony established that appellant should not be punished for the offenses. In short, the State presented ample evidence to support the trial court's label of a "predator" and assessment of the four, stacked twenty-year sentences, aside from the complained-of testimony.

Because we conclude that appellant was not harmed by the admission of L.J.'s testimony, we overrule appellant's first, second, third, and fourth points of error.

### Sufficiency of the Evidence to Support Assessment of Court Costs

In his fifth, sixth, seventh, and eighth points of error, appellant challenges the sufficiency of the evidence to support the trial court's assessment of $594 in court costs in each case. He

–10–

asks that we reform the judgment to delete the requirement that he pay the specific amount of court costs because the clerk's record does not contain a cost bill. After appellant filed his brief, however, the clerk's record in each case was supplemented and now contains a bill of costs. Specifically, each supplemental clerk's record contains two pages of a computer printout itemizing the costs assessed in the case and showing a total of $594 in court costs. Each supplemental clerk's record also includes a bill of costs certification signed by the deputy district clerk and certified by the district clerk. Because the clerk's record in each case now contains a cost bill that supports the costs assessed in each judgment, appellant's complaints that the evidence is insufficient to support the imposition of costs because the records do not contain a cost bill are moot. *See Johnson v. State*, 423 S.W.3d 385, 391–91 (Tex. Crim. App. 2014); *Coronel v. State*, 416 S.W.3d 550, 555 (Tex. App.—Dallas 2013, pet. ref'd). We overrule appellant's fifth, sixth, seventh, and eighth points of error.

Appellant also filed an objection in each case to the bill of costs in the supplemental clerk's records. He argues (1) the "unsigned, unsworn computer printouts" and "bill of costs certification" in each supplemental clerk's record do not qualify as a proper bill of costs for purposes of code of criminal procedure article 103.001 and (2) the record in each case does not indicate the computer printout was filed in the trial court or brought to the court's attention before the costs were entered into the judgments. We previously have addressed and overruled both of these arguments. *See Coronel*, 416 S.W.3d at 555–56 (concluding supplemental record filed by clerk satisfies mandate of code of criminal procedure and there is no requirement that cost bill be presented to trial court at any time before judgment); *see also Johnson*, 423 S.W.3d at 392–94 (concluding 2 pages of computer printout and certification signed by deputy clerk and seal of district clerk is "bill of costs for purposes of Chapter 103" and "matters pertaining to the imposition of court costs need not be brought to the attention of the trial court, including a bill of

–11–

costs prepared after a criminal trial"). Accordingly, we overrule appellant's objections to the cost bill contained in the supplemental clerk's record filed in each case.

We also note that in his original brief and his objections, appellant does not challenge the propriety or legality of the specific costs assessed. We therefore do not address those matters.

### Modification of the Judgment

In his ninth point of error, appellant asks this Court to modify the trial court's written judgment in cause number F-11-71319-X to reflect the correct statute for the offense under which he was convicted. The State agrees the judgment in this cause should be modified in the manner appellant requests.

In cause number F-11-71319-X, appellant was charged with and convicted of the offense of indecency with a child under section 21.11(a) of the penal code. *See* TEX. PENAL CODE ANN. § 21.11(a). Yet the trial court's judgment in that cause incorrectly recites that the statute for the offense is section 22.11 of the penal code, which describes the offense of harassment of a public servant. *See id.* § 22.11. Under appellate rule of procedure 43.2(b), we have the authority to correct a clerical error in a trial court's judgment and affirm the judgment as modified. *See* TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). We therefore sustain appellant's ninth point of error and modify the judgment in cause number F-11-71319-X to show that the statute for the offense is section 21.11(a) of the Texas Penal Code.

**Conclusion**

We affirm the trial court's judgments in in cause numbers F-11-71623-X, F-1171624-X, and F-11-71625-X. We modify the judgment in cause number F-11-71319-X as requested and affirm that judgment as modified.

/Ada Brown/
ADA BROWN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

130182F.U05

–13–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THOMAS EPPELSHEIMER, Appellant

No. 05-13-00182-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 6, Dallas County, Texas
Trial Court Cause No. F-11-71623-X.
Opinion delivered by Justice Brown.
Justices Lang and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 21st day of July, 2014.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THOMAS EPPELSHEIMER, Appellant

No. 05-13-00183-CR  V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 6, Dallas County, Texas
Trial Court Cause No. F-11-71319-X.
Opinion delivered by Justice Brown.
Justices Lang and Myers participating.

Based on the Court's opinion of this date, the trial court's judgment is **MODIFIED** as follows:

The "Statute for Offense" is modified to read: "21.11(a) Penal Code."

As modified, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 21st day of July, 2014.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THOMAS EPPELSHEIMER, Appellant

No. 05-13-00184-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 6, Dallas County, Texas
Trial Court Cause No. F-11-71624-X.
Opinion delivered by Justice Brown.
Justices Lang and Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 21st day of July, 2014.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THOMAS EPPELSHEIMER, Appellant

No. 05-13-00185-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 6, Dallas County, Texas
Trial Court Cause No. F-11-71625-X.
Opinion delivered by Justice Brown.
Justices Lang and Myers participating.


Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 21st day of July, 2014.